DISTRICT OF COLUMBIA, a Municipal
Corporation, Appellant,

v.

Jack J. SCHRAMM, Regional Administrator, Region III, U. S. EPA, et al.

No. 78–2209.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1979.

Decided June 18, 1980.

Frederick F. Stiehl, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, John C. Salyer and Richard G. Wise, Asst. Corp. Counsel, Washington, D. C., were on brief, for appellant.

Thomas A. Deming, Asst. Atty. Gen., State of Maryland, Annapolis, Md., with

whom Edward F. Lawson, Asst. Atty. Gen., State of Maryland, Annapolis, Md., was on brief, for appellee Andrews, Director of Maryland Water Resources Administration.

Nancy B. Firestone, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., John E. Varnum and Dirk D. Snel, Attys., Dept. of Justice, and Joan Z. Bernstein, Gen. Counsel, and Diane L. Olsson, Atty., Environmental Protection Agency, Washington, D. C., were on brief, for appellees.

Paul T. Sisson was on brief for appellee Washington Suburban Sanitary Commission.

Charles G. Dalrymple, Silver Springs, Md., and John J. Delaney, Washington, D. C., were on brief for appellee RCTS Charter Ass'n.

Stephen M. Truitt and David G. Burwell, Washington, D. C., were on brief for amicus curiae National Wildlife Federation urging reversal and remand.

Before J. EDWARD LUMBARD,* U. S. Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Though Rock Creek flows placidly through the Maryland countryside and the heart of Washington, D. C., apprehension about future quality of the creek's water has erupted into a dispute between these two jurisdictions. The District of Columbia (District) sought injunctive and declaratory relief against the United States Environmental Protection Agency (EPA or Agency), the state of Maryland, and their respective officials to revoke the operating permit of an advanced wastewater treatment plant that discharges effluent into the creek. The United States District Court for the District of Columbia denied relief, finding the District had not been harmed by operation of the plant. We agree and in addition conclude that Congress intended limited federal court review of state National Pollution Discharge Elimination System (NPDES) permits. Accordingly, we remand the case to the district court with instructions that it dismiss certain counts of the District's complaint, and we otherwise affirm.

## I. BACKGROUND

### A. Federal Water Pollution Control

One scar on America's record of technological and economic progress has been the pollution of its air and water. After several ineffective legislative responses to the pollution problem,[1] Congress passed the Water Pollution Control Act Amendments of 1972 (Clean Water Act), Pub.L.No. 92–500, 86 Stat. 816 (current version at 33 U.S.C. §§ 1251–1376 (1976 & Supp. I 1977)), "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." H.R.Rep.No. 911, 92d Cong., 2d Sess. 71 (1972), reprinted in 1 Cong.Research Serv., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 758 (1973) [hereinafter cited as Legislative History]. Congress established a goal of "eliminat[ing] the discharge of pollutants into the waters of the United States by 1985 and . . . achiev[ing] water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water to be achieved by 1981." Id.

To reach this goal, Congress has established strict limitations on the discharge of

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. These efforts included the Refuse Act of 1899, ch. 425, § 13, 30 Stat. 1121 (codified at 33 U.S.C. § 407 (1976)); Act of June 30, 1948, ch. 758, 62 Stat. 1155 (amended in 1972); Act of Nov. 3, 1966, Pub.L.No. 89–753, 80 Stat. 1246 (amended in 1972). The Senate committee studying federal efforts against water pollution in 1971 found that these statutes had been ineffective, concluding "the national effort to abate and control water pollution has been inadequate in every vital aspect." S.Rep.No. 414, 92d, Cong., 1st Sess. 7 (1971), reprinted in 2 Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1453 (1973) [hereinafter cited as Legislative History].

effluents into the nation's waterways. 33 U.S.C. §§ 1311–1328.[2] Congress has created the National Pollution Discharge Elimination System (NPDES) to enforce the limitations. Anyone wishing to discharge effluent into a waterway needs an NPDES permit, which limits the amount and types of pollutants which may be discharged into an affected waterway.

Congress also has enlisted the states in the battle against water pollution. Recognizing "the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," *id.* § 1251(b), Congress has let states assume the regulatory duties. A state may apply to the EPA to take responsibility for licensing under the NPDES all discharges into navigable waters[3] within its boundaries. If the state program meets certain requirements, *see id.* § 1342(b); 40 C.F.R. § 123.1–.62 (1979),[4] the Agency approves the program and suspends its own NPDES licensing program in that state. 33 U.S.C. § 1342(c). The Agency continues to receive copies of applications for NPDES permits and retains the power to veto state NPDES permits. *Id.* § 1342(d). It may waive this notice requirement, however, *id.* § 1342(e), and the responsibility for supervising state programs, *id.* § 1342(d)(3). Congress in this scheme thus placed on the states the burden of administering and approving NPDES applications.[5]

## B. *Maryland NPDES Permit Program*

Maryland has established its own water quality control program under its Department of Natural Resources and Water Resources Administration to administer requests for NPDES permits. The Regional Administrator of the EPA approved this program in September 1975. In their Memorandum of Agreement, state officials and the Regional Administrator concluded that the state would assume primary responsibility for the NPDES program, and the "Regional Administrator's role [would] be one primarily of issuing guidance, providing financial and technical assistance, and reviewing applications and other program accomplishments (to the extent possible) as required or deemed desirable by the parties involved." Memorandum of Agreement Regarding the NPDES Permit Program Between Maryland Department of Natural Resources and the Environmental Protection Agency, Region III at 2, *reprinted in* Joint Appendix (J.A.) at 36, 37.

Maryland and the EPA also has established a joint review program for certain NPDES applications. Under this procedure, the Regional Administrator participates more actively in the permit issuance process in conjunction with the state and the applicant. He must concur in the effluent limitations and in any other conditions included in the permit by the state. Once the permit is issued, he again assumes an advisory role.

## C. *The Rock Creek Plant Project*

This particular controversy involves the issuance of an NPDES permit by the state

2. These limitations called for those discharging effluent to employ the "best practicable control technology currently available" by 1977 and the "best available technology economically achievable" by 1983. 33 U.S.C. § 1311(b) (1976). Amendments to this section in 1977 revised the timetables for adoption of the pollution control technology. *See* Clean Water Act of 1977, Pub.L.No. 95–217, § 42(b), 91 Stat. 1566 (codified at 33 U.S.C. § 1311(b)(2)(A) (Supp. II 1978)).

3. Navigable waters "means the waters of the United States . . . ." 33 U.S.C. § 1362(7) (1976).

4. These statutory requirements include: ensuring the Administrator receives a copy of each NPDES application, *id.* § 1342(b)(4); giving notice to all states whose waters may be affected by the issuance of a permit and offering an opportunity for those states to submit written recommendations, *id.* § 1342(b)(3); requiring compliance by applicants with the provisions of 33 U.S.C. § 1318, *id.* § 1342(b)(2)(B); and having adequate authority to enforce the permit limitations, *id.* § 1342(b)(7).

5. After a public hearing, the EPA may withdraw its approval of a state's NPDES program that does not comply with federal requirements. *Id.* § 1342(c)(3).

of Maryland to the Washington Suburban Sanitary Commission (Sanitary Commission) to operate for five years an advanced wastewater treatment plant that may discharge up to three million gallons per day of treated effluent into Rock Creek. Officials and developers in Maryland proposed the plant to relieve the overburdened Blue Plains Sewage Treatment Plant by diverting sewage from Blue Plains and discharging the treated effluent into Rock Creek. The plant would allow continued growth in Montgomery County, Maryland, and at the same time give area officials time to devise a permanent solution to metropolitan Washington's acute shortage of sewage treatment capacity.

The Montgomery County Council approved the proposal to construct the plant in July 1975.[6] The Washington Suburban Sanitary Commission then submitted the proposal to the Maryland Water Resources Administration for an NPDES permit. The Water Resources Administration in turn notified the EPA of the application, which designated the application as meriting joint review. During a year-long study of the permit application, Maryland authorities mailed notices of the application to interested parties[7] and published classified advertisements in newspapers announcing public hearings on the application. *See* J.A. at 251, 257.

After the EPA indicated under its joint review procedures that it had no objections to the project, Maryland issued a permit to the Sanitary Commission on October 4, 1976. Pursuant to 33 U.S.C. § 1311(b)(1)(C) (1976), the permit established limitations on the discharge of effluent that incorporated both federal and more stringent state standards, *see* 1:1 Md.Reg. 40–41 (1974) (codified at COMAR [Code of Maryland Regulations] 08.05.04.03 (1979)).[8]

The District became involved seven months after issuance of the permit. District and Maryland officials exchanged letters and held meetings to resolve differences over the plant, which was under construction during this period. On May 2, 1978, after efforts at accommodation failed, the District filed suit in federal district court seeking declaratory relief and an injunction against the discharge of effluent by the plant into Rock Creek. Named as defendants were the EPA; the State of Maryland; and officials of the EPA, the Washington Suburban Sanitary Commission, and the Maryland Water Resources Administration.[9]

The plant began operation on September 14, 1978. Eleven days later, the court held a hearing on the District's complaint and on its consolidated motion for a temporary injunction prohibiting operation of the plant. Both sides presented witnesses and documentary evidence.

On September 25, 1978, the court entered judgment for the defendants. The court held that the plaintiff had

> failed to show that it will suffer irreparable injury because of the operation of the [plant]; plaintiff has not shown that the discharge of the treated effluent has had or will have an adverse impact on the water quality of Rock Creek or that it will violate the adopted water quality standards for Rock Creek.

*District of Columbia v. Schramm*, No. 78–0785, at 4 (D.D.C. Sept. 29, 1978), *reprinted*

---

**6.** The proposed sewage treatment plans received attention in the press. The Washington Post ran an article discussing the Montgomery County Council's approval of two sewage plants. *See* Wash. Post, July 23, 1975, at C–4, col. 1, *reprinted in* Joint Appendix (J.A.) at 255.

**7.** Officials of the Maryland Water Resources Administration assert that they included the District as a neighboring jurisdiction on the mailing list to receive information about proposed permits. Affidavit of Michael L. Roderick, at 1–2 (Aug. 14, 1978), *reprinted in* J.A. at 249–50. The District denies having received

any such notice. Affidavit of John V. Brink, at 2 (Aug. 18, 1978), *reprinted in* J.A. at 58.

**8.** These standards match those of the District of Columbia. *See* Summary of Water Quality Standards for Interstate Waters of the District of Columbia, at 6, *reprinted in* J.A. at 115.

**9.** RCTS Charter Associates and Clarence W. Gosnell, Inc., the joint venturers that constructed the Rock Creek plant, intervened as party defendants on August 22, 1978.

*in* J.A. at 449, 452. Having found no harm from the operation of the plant, the court did not resolve the District's claim regarding the lack of notice. In addition, the court found that issuance of an injunction would not be in the public interest. The court therefore denied injunctive and declaratory relief, citing the standards announced in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958).

## II. FEDERAL COURT REVIEW OF STATE NPDES DECISIONS

### A. *EPA's Acquiescence in Issuance of State NPDES Permit*

The District charges that the EPA's failure to veto Maryland's grant of an NPDES permit did not comport with the provisions of the Clean Water Act. The District views Maryland's failure to notify it, a downstream jurisdiction, as a fatal defect that compels revocation of the permit and closure of the plant until new studies are completed. Furthermore, the District argues that the Clean Water Act required the EPA and Maryland officials to consult with the Department of the Interior and the National Capital Planning Commission regarding a treatment plant that would degrade Rock Creek's waters. Finally, the District believes the EPA and Maryland impermissibly failed to incorporate limitations on infectious viruses in the permit itself and unlawfully included a treatment bypass provision that will allow the discharge of untreated sewage into Rock Creek. These errors, according to the District, justify granting injunctive relief barring the discharge of effluent into Rock Creek.

At the outset, however, the EPA raises a threshold jurisdictional issue. It contends that its decision not to object to a state-issued permit is one "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1976), and therefore not reviewable in federal court. The District responds that the EPA's participation in the joint review and approval of the permit application constituted final agency action reviewable under the Administrative Procedure Act, *id.* § 702 (1976).

■ Federal courts clearly may review Agency vetoes of state NPDES decisions. Under section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F), the United States courts of appeals are empowered to "[r]eview . . . the Administrator's action in issuing or denying any permit under [33 U.S.C.] section 1342 . . . ." *Id.* When the EPA objects to a state permit, "the precise effect is to 'deny[ ]' a permit within the meaning of section 509(b)(1)(F)." *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196, 100 S.Ct. 1093, 1095, 63 L.Ed.2d 312 (U.S. Mar. 17, 1980) (per curiam); *Republic Steel Corp. v. Costle*, 581 F.2d 1228, 1230 n.1 (6th Cir. 1978), *cert.·denied*, 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979). Direct review by the courts of appeals "ensure[s] prompt resolution of challenges to EPA's actions and . . . recognize[s] that EPA's veto of a state-issued permit is functionally similar to its denial of a permit in States which do not administer an approval permit-issuing program." *Crown Simpson Pulp Co. v. Costle*, 445 U.S. at 1094, 100 S.Ct. at 1094.

■ Review of the Agency's decision not to veto a state permit is a more difficult question.[10] When the Agency vetoes a permit, a clear record exists of its actions and reasons; when the Agency decides not to

---

**10.** Jurisdiction for the district court exists under the federal question provision, 28 U.S.C. § 1331 (1976). Other jurisdictional bases are not available. Plaintiffs brought this action in district court, so section 1369(b)(1)(F) cannot serve as a basis for judicial review. The Clean Water Act also contains a citizen-suit provision, *see* 33 U.S.C. § 1365(a) (1976), which gives the district court jurisdiction over actions brought by any citizen against the Administrator for failure to perform a nondiscretionary

duty or against any person violating effluent standards or limitations under the Act. *Id.* § 1365(a)(1), (2). This provision also does not apply here. The Administrator's actions in this case are discretionary, *see* text at pp. 860–862 *infra,* and the District does not allege that the operation of the Rock Creek plant violates the limitations contained in its NPDES permit. It instead contends that the issuance of the permit itself is unlawful.

act, there may be no record to review. Having examined the legislative scheme, the policies of the Clean Water Act, and the case law, we conclude that the Agency's decision not to veto a state NPDES permit is not reviewable in federal district court.

■ In considering the Clean Water Act, Congress carefully constructed a legislative scheme that imposed major responsibility for control of water pollution on the states. Once the EPA approves a state program for issuing NPDES permits, Congress envisioned the EPA's role as largely a supervisory one. The Agency retains a veto over the issuance of state permits, but it may also waive responsibility for objecting to noncomplying state permits and even waive notice of the NPDES applications. 33 U.S.C. § 1342(d)(3), (e).

The course of the Clean Water Act through Congress demonstrates the emphasis Congress placed on giving responsibility to the states and letting the Agency exercise discretion in supervising the NPDES program. The Senate version of the Act, S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in* 2 Legislative History 1534, originally required Agency approval for all major state-issued permits.[11] *See* S.Rep.No. 414, 92d Cong., 1st Sess. 71–72 (1972), *reprinted in* 2 Legislative History 1489–90. The House version, H.R. 11896, 92d Cong., 1st Sess. (1971), *reprinted in* 1 Legislative History at 893, however, entrusted more responsibility to the states; states with Agency-approved programs would themselves issue permits, subject only to a discretionary veto by the Agency. *See* H.R.Rep.No. 911, 92d Cong., 1st Sess. 127 (1972), *reprinted in* 1 Legislative History 814. This provision placed the major burden for regulating water pollution on the states. The House committee considering the bill stated:

representatives of the States, almost unanimously, stressed the need to put the maximum responsibility for the permit process in the States. They deplored the duplication and second guessing that could go on if the Administrator could veto the State decisions. The Committee believes that the States ought to have the opportunity to assume the responsibilities that they have requested.

*Id.*

The bill that emerged from the conference committee and became the Clean Water Act featured provisions of H.R. 11896 that gave the states the primary responsibility for issuing NPDES permits. The bill also made the EPA approval of state programs meeting the statutory requirements mandatory rather than discretionary, as in S. 2770. In addition, the final version incorporated the waiver provisions of the House and Senate bills, thereby permitting the EPA to waive the notification requirement under section 1342(e) and to waive its right to veto an application for failure to follow the guidelines under section 1342(d)(3).

These provisions reflect the desire of Congress to put the regulatory burden on the states and to give the Agency broad discretion in administering the program. As Representative James Wright stated in describing the NPDES permit process,

If the Administrator determines that a State has the authority to issue permits consistent with the act, he shall approve the submitted program. In that event, the States, under State law, could issue State discharge permits. These would be State, not Federal actions . . . ..

. . . The managers expect the Administrator to use this authority [over state programs] judiciously; it is their intent that the act be administered in such a manner that the abilities of the States to control their own permit programs will be developed and strengthened. They look for and expect State and local interest, initiative, and personnel to provide a much more effective program than that which would result

11. The Senate bill also contained provisions allowing the EPA to waive notification of permit applications. *See* S.2770, § 402(e), 92d Cong., 1st Sess. (1971), *reprinted in* 2 Legislative History 1690. This waiver provision now appears in the Clean Water Act at 33 U.S.C. § 1342(e).

from control in the regional offices of the Environmental Protection Agency.

118 Cong.Rec. 33761 (1972), *reprinted in* 1 Legislative History 262 (remarks of Rep. Wright).

 This legislative history compels the conclusion that the Agency's decision not to review or to veto a state's action on an NPDES permit application is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1976). Although section 701(a)(2) has a narrow scope, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), it applies here, where " 'the statutes are drawn in such broad terms that . . . there is no law to apply.' " *Id.* at 410, 91 S.Ct. at 821 (quoting S.Rep.No. 752, 79th Cong., 1st Sess. 26 (1945)). The Clean Water Act allows the EPA to choose whether to participate in the application for a state NPDES permit. The Act also gives the EPA freedom to waive notice of the application and to waive any violations in the permit. Certain guidelines apply to the application process, but these guidelines do not bind the Agency in its supervisory role of monitoring state permits. In reaching substantially the same conclusion, the Court of Appeals for the Fifth Circuit noted that

> the legislative history makes very clear that Congress intended EPA to retain discretion to decline to veto a permit even after the agency found some violation of applicable guidelines. That legislative history, more explicit and unequivocal than generally found, leans in almost every expression toward minimal federal intervention when a state plan has been approved.

. . . In light of the pervasiveness of this theme, . . . and the conferral of broad discretion to waive review of individual permits, we conclude that Congress intended to allow the Administrator to consider the significance of any guideline violations in terms of the overall goal of the [Act] . . . .

*Save the Bay, Inc. v. EPA,* 556 F.2d 1282, 1294 (5th Cir. 1977).[12]

That the Agency participated in a joint review of the application with Maryland officials does not alter this conclusion. Though the Agency fulfilled its responsibility of reviewing the "limitations and other conditions imposed as part of a draft permit," Memorandum of Agreement at 10, *reprinted in* J.A. at 45, by advising state officials concerning the effluent limitations and regional sewage treatment planning, *see* Letter from Charles W. Sapp to Arnold Schiffman (June 14, 1976), *reprinted in* J.A. at 127, such participation does not make the Agency's actions reviewable in federal district court. EPA involvement is still discretionary, and its involvement in the issuance of the plant's permit did not undercut the primary responsibility of the state of Maryland to consider and approve the NPDES application. Granting federal court review of the Agency's actions in cases such as this one would upset the federal-state balance struck by Congress: it would allow parties to create a basis for federal jurisdiction when federal involvement is merely secondary. As the Ninth Circuit stated in *Shell Oil Co. v. Train,* 585 F.2d 408 (9th Cir. 1978),

---

**12.** The Court of Appeals for the Second Circuit has agreed with this view of the Administrator's discretion under the Clean Water Act:

Neither the [Clean Water Act] nor its legislative history provide any clear direction to the Administrator as to when he should or should not reject any particular State permit that he finds does not conform with the guidelines and regulations under the Act. It would appear that the option to take no action, even when a permit does not conform, is committed to the Administrator's almost unfettered discretion. *See Greater New York Hospital Assoc. v. Matthews,* 536 F.2d 494 (2d Cir. 1976).

*Mianus River Preservation Comm. v. Administrator, EPA,* 541 F.2d 899, 909 n.24 (2d Cir. 1976).

The court in *Save the Bay* recognized two possible grounds for limited judicial review of the EPA's decision not to veto a state permit: failure by the Agency even to consider violations of guidelines in deciding not to veto a permit and consideration of impermissible factors in reaching its decision. 556 F.2d at 1295–96. .We doubt that Congress intended federal court review in these situations. *See* text at pp. 859–862 *infra.* Nonetheless, since neither of these situations has been shown to be present here, we do not reach this issue.

a holding that statutorily sanctioned advice by the EPA to a state constitutes final federal agency action reviewable in the federal courts would permit an applicant, dissatisfied with a decision of a state board, to circumvent the appellate process envisioned by the statute and bestow jurisdiction upon a federal court simply by alleging coercion or undue influence.

*Id.* at 414. *See generally* Note, *Jurisdiction to Review Informal EPA Influence Upon State Decisionmaking Under the Federal Water Pollution Control Act,* 92 Harv.L. Rev. 1814 (1979). Such a result would be unacceptable. Therefore, we hold that the Agency's actions regarding Maryland's approval of the NPDES permit for the plant are not reviewable in federal court.

**B.** *EPA's Obligation to Prepare an Environmental Impact Statement*

The District further contends that the Agency had a duty to prepare an environmental impact statement under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1976). The District cites as support for its contention 33 U.S.C. § 1371(c),[13] which states in part that "the issuance of a [NPDES] permit . . . for the discharge of any pollutant by a new source" can be a "major Federal action significantly affecting the quality of the human environment." *Id.* Such "major Federal action" requires an environmental impact statement. 42 U.S.C. § 4332(2)(C).

We disagree with the District's fundamental premise that the EPA "issued" the permit for the Rock Creek plant. After the study under the joint review program was completed, the EPA elected not to veto the project under 33 U.S.C. § 1342(d)(2). It was the state of Maryland that approved and issued the permit. As a district court considering the same question stated, "the determination of the federal government not to object . . . 'cannot realistically be classified as "Federal action" much less "major" Federal action' . . . ." *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board,* 453 F.Supp. 122, 125 (E.D.Va.1978) (quoting *Molokai Homesteaders Cooperative Association v. Morton,* 506 F.2d 572, 580 (9th Cir. 1974)). *See generally* McGarity, *The Courts, the Agencies, and NEPA Threshold Issues,* 55 Tex.L.Rev. 801, 837–38 & n.139, 851 (1977). These being no "major Federal action," the Agency was not required to prepare an environmental impact statement.[14]

**C.** *Maryland's Issuance of the NPDES Permit*

Congress did not explicitly provide a federal cause of action to persons seeking review of state decisions on NPDES applications. The District nonetheless claims that it has a federal cause of action implicit in the statutory scheme. The Maryland defendants, on the other hand, contend that federal law does not create such a cause of action and that the District is relegated to whatever rights and remedies may be available under Maryland law.

A cause of action may exist where the federal statute does not explicitly provide one. *See, e. g., J. I. Case Co. v.*

---

**13.** The relevant provision states in full:

Except for the provision of Federal financial assistance for the purpose of assisting the construction of publicly owned treatment works as authorized by section 1281 of this title, and the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this title, no action of the Administrator taken pursuant to this chapter shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (83 Stat. 352); . . .

33 U.S.C. § 1371(c)(1).

**14.** Furthermore, EPA regulations do not require an environmental impact statement for new source NPDES permits. Procedures involving environmental impact statements "apply only to the issuance of a new source NPDES permit by EPA and not to the issuance of a new source NPDES permit from any State which has an approved NPDES program in accordance with section 402(b) [33 U.S.C. § 1342(b)] of the [Clean Water Act]." 40 C.F.R. § 6.904(a) (1979).

*Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). A court must look to Congress's intent when enacting the federal statute to determine whether a corresponding federal right of action is created. *See Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In determining whether a private right of action exists, a court must consider four questions: (1) Is the plaintiff a member of the special class for whom the statute was created? (2) Is there evidence of legislative intent to confer or deny a right? (3) Is it consistent with the purpose of the legislative scheme to imply the right? (4) Is the subject matter an area traditionally relegated to state law, so that a cause of action based solely on federal law would be inappropriate? *Id.* at 78, 95 S.Ct. at 2088.

 Having considered these factors, we believe a federal right of action is not implicit in the Clean Water Act. The District is a member of the general class designed to be protected by the Act. The Act's structure and legislative history, however, argue strongly against implying a federal cause of action.[15] In authorizing the creation of state NPDES permit programs, Congress made clear that state permits would be issued "under State law [and] would be State, not Federal, actions . . . ." 118 Cong.Rec. 33761 (1972), *reprinted in* 1 Legislative History at 262 (remarks of Rep.

Wright). Before granting a state authority to issue these permits, Congress requires the state to create adequate enforcement mechanisms for administering its program. 33 U.S.C. § 1342(b). A state can qualify to "establish and administer under State law" its own NPDES program only if the state attorney general submits a statement "that the laws of such State . . . provide adequate authority to carry out the program." *Id.*[16] Among other requirements,[17] the state must have sufficient authority "[t]o abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1342(b)(7). By requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit-granting powers under the Act, Congress must have intended that states apply their own law in deciding controversies involving state permits.

 Given the existence of adequate state remedies and the strong current of federalism in the Clean Water Act, we believe we should not infer a federal right of action in this case. The state courts are the proper forums for resolving questions about state NPDES permits, which are, after all, questions of state law. We therefore remand this case to the district court with instructions to dismiss the complaint insofar as it deals with Maryland's issuance of an NPDES permit for the Rock Creek plant.

**15.** One commentator even argues that federal courts lack jurisdiction with regard to state NPDES permits:

The omission of state permit action from review in federal courts of appeals does not seem inadvertent, since Congress explicitly provided for such review of identical federal actions under [33 U.S.C. § 1369(b)]. No reason appears for thinking Congress preferred district court review for state permit action, since the statute contemplates identical hearings before state and federal agencies. If federal review were to be provided, the treatment of comparable federal action suggests it would have been in the appellate court. The omission, therefore, is persuasive if not compelling evidence of an intention to preclude all initial federal court review, especially since the presence of a state officer as defendant and the probable existence of ancil-

lary state law issues furnish plausible reasons for such a decision.

Currie, *Judicial Review under Federal Pollution Laws,* 62 Iowa L.Rev. 1221, 1227–28 (1978) (footnotes omitted).

We believe we have jurisdiction on this question under 28 U.S.C. § 1331 (1976). Nonetheless, congressional silence on federal court review of state permits is consistent with the view that challengers to those permits should be relegated to state law remedies in state courts.

**16.** The Administrator of the Agency also must ascertain that the state has adequate authority to administer the NPDES program. 33 U.S.C. § 1342(b).

**17.** For examples of some of the other statutory requirements, see note 4 *supra.*

## III. FEDERAL COMMON LAW OF NUISANCE

The District also contends that the Maryland defendants are violating the federal common law of nuisance by discharging effluent into Rock Creek. In *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), the Supreme Court recognized such a cause of action for states [18] injured by pollution of interstate or navigable waters. The Court concluded that such pollution presented a general federal question, with the action cognizable under federal common law in federal district court under 28 U.S.C. § 1331 (1976).[19] To be entitled to equitable relief, the complainant must demonstrate "that the defendant is carrying on an activity that is causing an injury or significant threat of injury to some cognizable interest of the complainant." *Illinois v. City of Milwaukee*, 599 F.2d 151, 165 (7th Cir. 1979). The District has failed to make such a showing and therefore is not entitled to equitable relief.

The district court in its opinion held that the District had failed to demonstrate any harm from the operation of the plant. We believe this finding is clearly supported in the record. The District did not have reliable data documenting the impact of the discharge of effluent by the plant on the quality of water in Rock Creek; in fact, the District's data on water quality came entirely from tests taken before the plant began operations. J.A. at 332–33. Furthermore, the available data were inconclusive. The parties disagreed on the proper level of dissolved oxygen to use in the Streeter-Phelps formula, which measures biochemical oxygen demand of a waterway, and the District presented no evidence on the recovery of the creek's oxygen levels in the twelve miles from point of discharge to the District's border.

Many variables affect a stream's water quality, for example, the natural aeration of the stream, its confluence with tributaries, the seasons, and the urban or rural setting of the stream. The District did not account for many of these variables in presenting its evidence to the district court. If the District had shown that the plant is injuring Rock Creek, it would have been entitled to some form of relief. On the present record, however, the district court properly concluded that the District had not demonstrated harm to Rock Creek.[20]

## IV. CONCLUSION

Under the Clean Water Act, interstate cooperation is vital in dealing with water pollution. Pollution does not stop at state borders; neither should the cooperation be-

18. For purposes of federal water pollution laws, the District is considered to be a state. 33 U.S.C. § 1362(3) (1976).

19. The Court stated: "The question is whether pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of § 1331(a). We hold that it does; and we also hold that § 1331(a) includes suits brought by a State." *Illinois v. City of Milwaukee*, 406 U.S. 91, 99, 92 S.Ct. 1385, 1390, 31 L.Ed.2d 712 (1972).

The case came before the Court on Illinois' motion for leave to file a bill of complaint. Illinois sought to invoke the Court's original jurisdiction under 28 U.S.C. § 1251(a)(1) (giving "original and exclusive jurisdiction of [all] controversies between two or more States," *id.*). The Court denied the motion but held that jurisdiction existed in the district courts under the federal common law.

In creating the cause of action, the Court noted that "[i]t may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance." *Id.* at 107, 92 S.Ct. at 1395. The Court of Appeals for the Seventh Circuit has concluded that passage of the 1972 and 1977 Clean Water Acts does not preempt the federal common law action. *Illinois v. City of Milwaukee*, 599 F.2d 151, 163 (7th Cir. 1979). It based this conclusion on its reading of 33 U.S.C. § 1365, which states that "[n]othing in this section [permitting citizens suits] shall restrict any right which any person . . . may under any statute or common law to seek enforcement of any effluent standard or limitation to seek any other relief . . . ." *Id.* The court concluded that this section "indicat[ed] that preemption of existing remedies was not intended. There is nothing in the phrase 'any statute or common law' that suggests that this provision is limited to state common law." *Illinois v. City of Milwaukee*, 599 F.2d at 163.

20. We have considered the District's other claims and find them to be without merit.

tween different jurisdictions. We pray that, in the future, jurisdictions can resolve disputes amicably by focusing on the common enemy, pollution. If this cooperation does not take place, we and our children will all be the losers.

*Affirmed in part and remanded in part with instructions.*