United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 19, 1998 Decided March 23, 1999 

 No. 98-1027

 General Motors Corporation, 

 Petitioner

 v.

 Environmental Protection Agency and 

 Carol M. Browner, 

 Administrator, U.S. Environmental Protection Agency, 

 Respondents

 On Petition for Review of an Order of the 

 Environmental Protection Agency

 Michael F. McBride argued the cause for petitioner. With 
him on the briefs were LaJuana S. Wilcher, D. Randall 
Benn, Robert J. Kinney, Brenda Durham, and James P. 
Walle.

 Christopher S. Vaden, Attorney, U.S. Department of Jus-
tice, argued the cause for respondents. On the brief were 


Lois J. Schiffer, Assistant Attorney General, Karen L. Eg-
bert, Attorney, and Richard T. Witt, Steven J. Sweeney, and 
Reginald Pallesen, Attorneys, Environmental Protection 
Agency.

 Scott M. DuBoff, Kenneth S. Kaufman, Saone Baron 
Crocker, Julie Becker, Thomas M. Sneeringer, George Vary, 
Charles H. Lockwood, Fred Main, Robin S. Conrad, J. 
Walker Henry, Jan Amundson, Marjorie E. Powell, and 
John W. Pettit were on the brief for amici curiae American 
Automobile Manufacturers Association, et al.

 Joseph M. Polito, Jay E. Brant, Christopher J. Dunsky, 
Kenneth C. Gold, and Daniella D. Landers were on the brief 
for amici curiae Dott Industries, Inc., et al.

 Before: Williams, Ginsburg, and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: The Environmental Protection 
Agency determined that General Motors violated a Clean 
Water Act permit issued by the State of Michigan, for which 
the agency imposed an administrative penalty of $62,500. 
GM petitions for review, arguing primarily that the EPA 
erred in refusing to consider the Company's collateral attack 
upon the validity of the state-issued permit. We conclude, 
first, that the EPA reasonably interpreted the Clean Water 
Act, 33 U.S.C. s 1311 et seq., to preclude such a collateral 
attack in the course of an enforcement proceeding and, 
second, that substantial evidence supports the EPA's finding 
that GM violated the permit. Accordingly, we deny the 
Company's petition for review.

 I. Background

 Section 402 of the CWA, id. s 1342, establishes the Nation-
al Pollutant Discharge Elimination System (NPDES), a per-
mitting program through which the EPA and the several 
States implement various regulatory limits upon the dis-
charge of pollutants into navigable waters. Forty-two States, 
including Michigan, administer the NPDES program within 
their borders. See s 1342(b). Although those States assume 

responsibility as the primary permitting authority, see 
s 1342(c), the EPA retains the power to enforce state-issued 
permits in federal court. See, e.g., s 1319.

 In 1984 GM applied to the Michigan Department of Natural 
Resources for an NPDES permit to discharge stormwater 
from a point source, known as "Outfall 002," at a plant in 
Pontiac, Michigan. The MDNR initially advised GM that it 
would not act upon the application until later that year, when 
GM would be applying to renew its NPDES permit for the 
other point sources at the plant. Upon receiving the renewal 
application, however, the MDNR decided not to address the 
stormwater permit application for Outfall 002 but rather to 
revisit that matter "when EPA finalizes stormwater discharge 
permit regulations." In 1987 the Congress put a stop to the 
EPA's ongoing attempt to craft stormwater permit regula-
tions by prohibiting, except in limited circumstances, "the 
Administrator or the State ... [from requiring] a permit 
under this section for discharges composed entirely of storm-
water." 33 U.S.C. s 1342(p)(1).*

 In June, 1988 the MDNR issued GM a stormwater NPDES 
permit for Outfall 002 based upon its 1984 application. The 
permit advised GM that if aggrieved by its terms the Compa-
ny could petition the MDNR for review but that the agency 
"may reject any petition filed more than 60 days after issu-
ance as being untimely." The permit, which specified limits 
upon GM's discharge of copper, lead, and zinc, was to be in 
effect through October 1, 1990. GM could renew the permit 
by submitting the appropriate forms "no later than 180 days 
prior to the date of expiration." GM did not challenge the 
terms of the permit. Meanwhile, in August, 1988, the Pontiac 
plant ceased operating.

 As required by its permit, GM began to submit to the 
MDNR periodic discharge monitoring reports (DMRs) for 
Outfall 002. Beginning in May, 1989 the DMRs revealed that 
water discharged at Outfall 002 contained levels of metals in 

__________
 * This prohibition was to last until 1992, but was extended by 
statute to 1994 and then by regulation to 2001. See Pub. L. No. 
102-580, s 364(1) (1992); 60 Fed. Reg. 40,230, 40,230/3 (1995).

excess of the limits set in the permit. GM determined that 
those levels were the result not of cross-connections to the 
plant's idled operations but of some combination of metals 
present in the rain and metals leached from the roofs of 
buildings and from copper gutters.

 In 1991 the EPA twice ordered GM to come into compli-
ance with the terms of its permit. GM responded by coating 
most of the roofs and gutters, which lowered the concentra-
tions of metals in the discharges, but did not bring GM into 
full compliance with the terms of its permit. In 1993 the 
EPA filed an administrative complaint against GM under 
s 1319(g)(1), alleging 92 violations of its NPDES permit and 
seeking the maximum administrative penalty ($125,000) per-
mitted under s 1319(g)(2)(B).

 After a hearing an Administrative Law Judge held that GM 
had violated the terms of its permit. First, the ALJ rejected 
GM's claims that when found in stormwater copper, lead, and 
zinc are not "pollutants" within the meaning of the CWA, see 
s 1362(6), (13), and that channeling stormwater to a point 
source does not constitute adding pollutants to navigable 
waters. Second, the ALJ held that GM's failure to challenge 
its NPDES permit within 60 days of its issuance by the 
MDNR prevented the Company from mounting a collateral 
attack upon the permit in the course of the EPA enforcement 
action; therefore he did not consider GM's claims that the 
permit was void both for mutual mistake and under the 
prohibition of stormwater permits in 33 U.S.C. s 1342(p). 
Third, based upon his reading of Michigan case law and upon 
GM's conduct after October 1, 1990--the Company continued 
to submit DMRs and thrice wrote to the MDNR requesting 
that it terminate the permit for Outfall 002--the ALJ held 
that the permit had not expired upon that date despite GM's 
failure to apply for an extension at least 180 days prior 
thereto. Finally, the ALJ rejected GM's skeletal equal pro-
tection and due process claims on the ground that GM's 
status as an NPDES stormwater permittee both distin-
guished it from other companies with similar discharges and 
gave it notice of the basis for the enforcement action against 
it.


 The ALJ assessed GM a civil penalty of $62,500, half the 
amount sought by the EPA, because GM's violations were not 
willful and because but for the Company's apparently unique 
status as holder of an NPDES permit for discharges of 
stormwater it likely would have faced no penalty at all. See 
s 1319(g)(3) ("In determining the amount of any penalty 
assessed under this subsection, the [agency] ... shall take 
into account ... such other matters as justice may require"). 
The ALJ also held that if the Environmental Appeals Board 
or this court reversed his ruling that the permit continued in 
effect after October 1, 1990, then the 39 violations that 
occurred before that date would still warrant a penalty of 
$62,500. The EAB affirmed the judgment of the ALJ.

 II. Analysis

 We review the EPA's finding of violations of a permit 
issued under the Clean Water Act for lack of "substantial 
evidence in the record, taken as a whole," and the assessment 
of an administrative penalty for "abuse of discretion," 33 
U.S.C. s 1319(g)(8), as we would under the Administrative 
Procedure Act, 5 U.S.C. s 706(2)(A), (E). Cf. Buxton v. 
EPA, 961 F. Supp. 6, 9 (D.D.C. 1997). Because in this case 
GM does not argue that the EPA abused its discretion in 
assessing the penalty, we address only the question whether 
substantial evidence supports the agency's finding that the 
Company violated the terms of its permit.

 GM raises a threshold challenge to the EPA's reliance upon 
the Clean Water Act rather than upon state law and, as a 
fallback position, challenges the EPA's interpretation of the 
Clean Water Act. We dispose of those arguments before 
turning to GM's other objections to the EPA's decision.

 A.Federal versus State Law

 GM's initial argument is that the EAB erred in following 
federal rather than Michigan law, which arguably permits a 
collateral attack upon a state-issued permit when the State 
initiates the enforcement proceeding. See Michigan v. Sper-
andeo, 112 Mich. App. 337, 342, 315 N.W.2d 863, 865 (1981). 
Apparently, in GM's view the alternative to state law on the 

question of collateral attacks is federal common law, which 
would be inappropriate under the Supreme Court's teaching 
in O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994). See id. 
at 87 (limiting federal common law to situations in which 
"there is a significant conflict between some federal policy or 
interest and the use of state law").

 The pertinent distinction between this case and O'Melveny, 
however, is that here there is a federal statute to apply. 
Accordingly, our task is but to "construe[ ] the language of 
[the] federal statute ... [an] enterprise [that] is, and always 
has been, a matter of federal law." RTC v. Diamond, 45 
F.3d 665, 671 (2d Cir. 1995); see also Auction Co. of Am. v. 
FDIC, 132 F.3d 746, 749 (D.C. Cir. 1997) (statute applies "by 
its own terms ... not by virtue of any lawmaking power of 
federal courts"). Therefore, there is no choice of law issue.

 Nor do the cases GM cites provide any support for the 
proposition that state law governs which defenses a permittee 
may raise in the course of a federal proceeding to enforce the 
terms of a state-issued permit. See United States v. Puerto 
Rico, 721 F.2d 832 (1st Cir. 1983) (resolving question whether 
CWA ousts federal courts of their original jurisdiction, under 
28 U.S.C. s 1345, of all suits brought by the United States, 
not whether federal enforcement agency must apply state 
law); District of Columbia v. Schramm, 631 F.2d 854, 863 
(D.C. Cir. 1980) (holding that CWA does not create "implied 
right of action" for private party to challenge state permitting 
decision, not that state law follows state permit into federal 
forum for enforcement of CWA).

 Accordingly, we reject GM's claim that the Environmental 
Appeals Board erred in looking to federal law in order to 
determine whether GM could raise a collateral attack upon 
the validity of its permit in an administrative penalty proceed-
ing brought pursuant to s 1319(g).

 B.What Does Federal Law Allow?

 As noted above, under s 1319(g)(8) the standard for re-
viewing the EPA's finding that a person has violated a permit 
is whether "there is ... substantial evidence in the record, 


taken as a whole, to support the finding of a violation." In 
this case GM claims there is no substantial evidence that it 
violated its permit because the evidence demonstrates that 
the permit was invalid from the outset, but the EPA refused 
to hear this attack upon the validity of the permit. The 
question now before us, therefore, is whether the EPA erred 
in interpreting the CWA to limit the grounds upon which GM 
may challenge the validity and applicability of its permit in 
this federal enforcement proceeding. Cf. Hoffman Homes, 
Inc. v. EPA, 999 F.2d 256, 260-61 (7th Cir. 1993) (reviewing 
EPA's interpretation of CWA regulations in course of admin-
istrative penalty proceeding).

 As GM suggests, because the EPA is charged with adminis-
tering s 1319(g)(1), we review its decision per the familiar 
analysis of Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984). 
Our first task, using the "traditional tools of statutory con-
struction" is to determine whether the Congress has spoken 
to "the precise question at issue," id. at 843 n.9. If so, then 
we "must give effect to the unambiguously expressed intent 
of Congress." Id. at 842-43. If the Congress has not 
expressed itself on that question, then Chevron step two 
requires the court to defer to the agency's interpretation if it 
"is reasonable and consistent with the statutory purpose." 
Ohio v. United States Dep't of Interior, 880 F.2d 432, 441 
(D.C. Cir. 1989).

1.Chevron step one

 In its brief, GM raised two arguments against the EPA's 
interpretation. First, GM claimed that the EPA required it 
to exhaust its state administrative remedies, despite the lack 
of an exhaustion requirement in the CWA and in the teeth of 
the Supreme Court's teaching that such a requirement can be 
imposed only by positive law--that is, by statute or agency 
rule. See Darby v. Cisneros, 509 U.S. 137, 154 (1993); see 
also Time Warner Entertainment Co. v. FCC, 144 F.3d 75, 79 
n.5 (D.C. Cir. 1998) ("[J]udge made notions of 'common law' 
[exhaustion] always yield to statutes--particularly in adminis-
trative law"). An exhaustion requirement, however, is not 
the same as a prohibition upon collateral attack. The former 


refers to administrative or judicial proceedings that must be 
completed as a prelude to federal judicial review; in the 
reviewing forum, of course, such proceedings do not have res 
judicata effect. For example, on a petition to review a 
decision of the NLRB, a federal court will not hear an issue 
that was not first raised before the agency; an issue that was 
raised before the agency, however, is not res judicata but 
open to review. See, e.g., Exxel/Atmos, Inc. v. NLRB, 147 
F.3d 972, 978 (D.C. Cir. 1998); see also 28 U.S.C. 
s 2254(b)(1)(A) (federal court shall not grant a state prison-
er's petition for writ of habeas corpus unless "the applicant 
has exhausted the remedies available in the courts of the 
State"). In contrast, the state administrative and judicial 
proceedings that GM failed to pursue when the MDNR issued 
its permit would not have been but a prelude to further 
review by the EPA. On the contrary, had GM pursued its 
state remedies and prevailed, then there would have been no 
permit for the EPA to enforce; had GM done so and lost, 
then it would have been prevented, under the doctrine of res 
judicata, from relitigating the validity of its permit in a later 
enforcement proceeding before the EPA.

 At oral argument, GM in fact acknowledged that the EAB 
had merely been imprecise, using the language of exhaustion 
and of prohibition interchangeably; the Board did not pur-
port to require that the Company have exhausted its state 
remedies in order to challenge the validity of its permit in the 
EPA enforcement proceeding. That is, the EAB did not even 
imply that it could have heard GM's challenge to the validity 
of its permit if only GM had previously sought state adminis-
trative and judicial review of that permit (and presumably 
been denied relief in those fora). Because the EAB did not 
interpret the CWA to require exhaustion of state remedies 
prior to raising a collateral attack upon the validity of a 
permit in a federal enforcement proceeding, GM's first argu-
ment fails. (For the same reason, the argument made by a 
number of Michigan companies appearing as amici--that even 
if the EAB correctly imposed an exhaustion requirement, GM 
nonetheless should be permitted collaterally to attack its 

permit under the authority of McKart v. United States, 395 
U.S. 185 (1969)--is irrelevant.)

 Second, GM (joined by the Michigan amici) argues that the 
CWA allows a collateral attack upon a state-issued NPDES 
permit in an enforcement proceeding because s 1369(b)(2) 
prohibits only collateral attacks against "[a]ction[s] of the 
Administrator with respect to which review could have been 
obtained under [s 1369(b)(1)]," of which one is "issuing or 
denying any [NPDES] permit." A state-issued NPDES per-
mit, GM points out, is neither an action of the Administrator 
nor otherwise made reviewable under s 1369(b)(1); therefore, 
the argument goes, the prohibition of collateral attacks in 
s 1369(b)(2) does not bar its challenge in this federal proceed-
ing to the validity of its state-issued permit. Further, be-
cause references to state-issued and EPA-issued permits are 
so often coupled in the Clean Water Act, see, e.g., 33 U.S.C. 
ss 1311(i) & (k), 1319(c)-(d) & (g), 1342(p), GM would have us 
infer that, by referring in s 1369(b)(2) solely to "[a]ction[s] of 
the Administrator," the Congress intended not to bar a 
collateral attack against a state-issued permit; expressio uni-
us est exclusio alterius.

 The inference GM would have us draw, however, simply 
does not follow. Section 1369(b)(1) authorizes the federal 
courts of appeals to review certain actions of the EPA, not to 
review the permitting decisions of the States. The failure of 
the Congress in s 1369(b)(2) expressly to forbid collateral 
attacks upon state permits is of no import, therefore. That 
is, not having authorized any review of state permits in the 
first place, the Congress simply had no reason to single out 
and prohibit collateral review of state permits.

 In sum, neither of GM's arguments persuades us that the 
Congress resolved the question whether a state permittee 
may collaterally challenge the validity of its state-issued 
permit in the course of a federal enforcement proceeding. 
We must therefore proceed to Chevron step two and deter-
mine whether the EPA reasonably interpreted the CWA to 
preclude such a collateral attack.


2.Chevron step two

 Presumably, the EPA would not find a permit violation if a 
permit holder could demonstrate that a state court had 
previously decided that the permit was void ab initio; cer-
tainly we would not find reasonable an interpretation of the 
CWA that precluded such a challenge to an EPA enforcement 
action. GM can point to no such decision, however, because it 
declined to take advantage of available state procedures to 
challenge its permit. Cf. PIRG v. Powell Duffryn Terminals 
Inc., 913 F.2d 64, 78 & n.27 (3d Cir. 1990) (permittee "not 
denied due process" when denied opportunity collaterally to 
attack permit because "it simply failed to use the process 
available to it"). And the EPA persuasively argues that it 
reasonably interpreted the Act to prevent GM from doing in a 
federal enforcement proceeding what the Company had de-
clined to do before the MDNR and the Michigan state courts.

 First, the Clean Water Act assigns to the participating 
states the primary role in administering the NPDES permit-
ting program. See American Paper Inst., Inc. v. EPA, 890 
F.2d 869, 874 (7th Cir. 1989) (stating it "seems beyond 
argument that we should construe the [Clean Water] Act to 
place maximum responsibility for permitting decisions on the 
states"). As the EPA states, precluding collateral attacks 
ensures that "the States [have] the opportunity as a threshold 
matter to address objections" to the permits they issue. 
Moreover, when a permit has been issued by a state agency, 
it alone will have the information pertinent to an attack upon 
the decisionmaking process that led to the issuance of that 
permit. Not only would the EPA have to expend considera-
ble resources to obtain the information from the state agency; 
it would also be second-guessing that agency, which is incon-
sistent with the primary role of the States under the Act.

 Relatedly, the EPA argues that precluding collateral at-
tacks is "consistent with Congress' desire to limit the scope of 
enforcement proceedings," as evidenced by a committee re-
port on the 1972 Clean Water Act amendments: "Enforce-
ment of violations of requirements under this Act should be 
based on relatively narrow fact situations requiring a mini-
mum of discretionary decisionmaking or delay." S. Rep. No. 
92-414, at 64 (1971). While we might not consider such a 

report indicative of the intent of the whole Congress, we do 
think it bolsters the agency's claim to have made a reasonable 
interpretation of the Act. If the EPA cannot preclude a 
collateral attack upon a state-issued permit, then it will find 
enforcement proceedings burdened by all manner of objec-
tions to the state proceedings leading up to issuance of the 
permit. Enforcement will become a protracted rather than 
an expedited undertaking.

 Finally, this court, in a dictum in Schramm, noted that 
"congressional silence on federal court review of state permits 
is consistent with the view that challengers to those permits 
should be relegated to state law remedies in state courts." 
631 F.2d at 863 n.15. Certainly the EPA, acting in accor-
dance with this dictum, the division of authority in the Act 
between state and federal permitting agencies, and the Sen-
ate Committee's expectation that enforcement proceedings 
would be straightforward and speedy, could reasonably inter-
pret the Act to remit to a state forum any attack upon the 
validity of a state permit. Therefore, applying Chevron step 
two, we conclude that the EPA was not unreasonable in 
interpreting the CWA to preclude GM from attacking the 
validity of its state permit in this federal enforcement pro-
ceeding.

 C.GM's Other Challenges

 GM raises two arguments that are not foreclosed by the 
conclusion reached immediately above. Each may be re-
solved in short order.

 First, GM contends the EPA erred in concluding that the 
permit for Outfall 002 did not expire on October 1, 1990. 
Recall the ALJ held that the appropriate penalty would be 
the same regardless of whether GM was responsible for the 
discharges after that date, and GM did not challenge the 
ALJ's penalty calculations before the EAB or this court. 
Therefore, we need not resolve whether substantial evidence 
supports the EPA's finding that GM violated the terms of its 
permit after October 1, 1990; even if GM did not do so, its 
penalty would still be $62,500.


 Second, GM claims it was denied due process because it 
lacked notice that "metals present in rainfall or leached from 
roofs and gutters would be considered 'pollutants' that were 
the responsibility of the permit holder." The permit for 
Outfall 002, however, clearly states that "the permittee is 
authorized to discharge an unspecified amount of stormwater 
runoff .... [which] shall be limited [to 140 F/l of copper, 75 
Fg/of lead, and 1000 Fg/l of zinc]." GM, in its correspondence 
informing the MDNR of its permit violations, itself counted 
the ambient and leached metals as contributing to those 
violations. Consequently, GM's lack of notice claim rings 
hollow, to say the least. See NRDC v. EPA, 673 F.2d 400, 
406-07 (D.C. Cir. 1982) ("Each individual subject to the 
[Consolidated Permit Regulations] will of necessity have par-
ticipated in a permit proceeding before being punished for 
violating the conditions specified in his permit. A polluter 
charged with violating those conditions will certainly be on 
notice of the duty he is alleged to have breached").

 This exhausts GM's challenges to the EPA's finding that 
the Company violated its NPDES permit for Outfall 002. 
GM does not contest the EPA's conclusion that the informa-
tion contained in the DMRs it submitted constitutes substan-
tial evidence that GM violated its permit on at least 39 
occasions prior to October 1, 1990. Accordingly, we hold that 
substantial evidence supports the EPA's finding of violations.

 III. Conclusion

 For the foregoing reasons, the petition for review is

 Denied.