**AMERICAN PAPER INSTITUTE, INC., et al., Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

Civ. A. No. 89–0655–B.

United States District Court, S.D. Alabama, S.D.

Dec. 4, 1989.

G. Sage Lyons and Charles L. Miller, Jr., Mobile, Ala., and Russell S. Frye, Washington, D.C., for plaintiffs.

Richard B. Stewart, Letitia J. Grishaw and Diane Regas, U.S. E.P.A., Washington, D.C., Jacqueline F. Colson and Craig A. Higgason, U.S. E.P.A., Atlanta, Ga., and Edward Vulevich, Mobile, Ala., for defendants.

## MEMORANDUM OPINION AND ORDER

BUTLER, District Judge.

This matter is before the Court on a motion for preliminary injunction whereby the plaintiffs, a group of pulp and paper mills located within Region IV and their trade association, American Paper Institute ("API")[1], seek to enjoin the United States Environmental Protection Agency ("EPA") from implementing a policy statement issued by EPA. This statement offers guidance to the states within EPA's Region IV regarding the discharge of dioxin into rivers and streams from pulp and paper mills. The plaintiffs contend that the EPA should

---

1. For the sake of convenience the Court will refer to the plaintiffs as "API" or plaintiffs.

be enjoined from implementing the policies set forth in the Region IV policy statement because EPA has failed to follow certain rulemaking procedures applicable to final agency action. The Court, having considered the motion for preliminary injunction, the briefs, affidavits, and documentary evidence submitted in support and in opposition thereto and the testimony and oral argument presented at the hearing on this motion, finds that the plaintiffs are not entitled to a preliminary injunction.

## FINDINGS OF FACT

The document at issue in this case is entitled "EPA–Region IV Regulation of Dioxin Discharges from Pulp and Paper Mills That Bleach With Chlorine" and was issued to the states within Region IV by the EPA's Region IV administrator in May, 1989.[2] The Region IV document was based on a national EPA guidance document regarding the regulation of dioxin. The document sets forth several changes to be made regarding the regulation of dioxin discharges from pulp and paper mills including interim control procedures, a suggested water quality-based criterion of dioxin concentration of .013 parts per quadrillion, listing requirements under § 304($l$) and the EPA's expectation of the states' permitting requirements.

Prior to issuing this document, the director of the EPA's Region IV Water Management Division submitted the guidance document or policy statement to the states for review and comment. Four states submitted favorable comments. (Plaintiffs' Exhibit 1). In his letter transmitting the guidance document to the Georgia Department of Natural Resources, the director referred to the enclosed document as the "final revised EPA–Region IV approach to regulation of dioxin discharges from pulp and paper mills that bleach with chlorine". The letter also requested that the state "begin implementation [of the approach] immediately and inform [EPA] regarding its plans as soon as possible."

The policy statement challenged by API consists of guidance by the EPA issued to states within Region IV on designing technology-based and water quality-based permit limitations under the CWA to control the discharge of dioxin into the region's waters by pulp and paper mills. The CWA established a bifurcated system to regulate the discharge of pollutants into the nation's waters.

The application of the policy statement in question is set against a regulatory framework of the CWA by which regulatory responsibilities are split between the states and the EPA. Each state is required to adopt water quality standards which specify the amount of pollutants which may be present in that state's waters. 33 U.S.C. § 1313(c)(1). These standards must be approved by the EPA, or if not approved, the EPA must adopt water quality standards for the state. 33 U.S.C. § 1313(c)(3). In order to ensure that these water quality standards are met, the states also must issue permits called National Pollutant Discharge Elimination System ("NPDES") permits to mills which discharge pollutants into the states' waters. 33 U.S.C. § 1342(b). These permits contain limitations on the amount of pollutants discharged by each mill or point source. 33 U.S.C. § 1311(b)(1)(C). State-issued NPDES permits also must be approved by the EPA. The Administrator of the EPA may object to the issuance of a permit in which case the state must submit a revised permit meeting the Administrator's objection. 33 U.S.C. § 1342(d). If the state fails to submit a revised permit, the Administrator may issue a federal NPDES permit. 33 U.S.C. § 1342(d)(4).

Because Congress has placed a high priority on regulating the discharge of toxic pollutants, § 304($l$) of the CWA now requires states to submit to EPA a list of waters that are not expected to achieve applicable water quality standards due to the discharge of certain toxic pollutants such as dioxin, called "short lists". 33

**2.** The EPA's Region IV consists of several southeastern states including Alabama. The various states, except Florida, administer the provision of the Clean Water Act ("CWA") within parameters established by EPA.

U.S.C. § 1314($l$). In addition, for each waterway listed, the state is required to list the point source, or mill, discharging the pollutant and to develop an individual control strategy ("ICS") for that mill to achieve water quality standards within three years. 33 U.S.C. § 1314($l$)(1)(C), (D). Once again, the EPA has the authority to approve or disapprove a state's list or ICS and develop its own lists and ICS's in cooperation with the state.

Whenever the EPA disapproves a state action and substitutes its own NPDES permit or ICS, it must follow certain rulemaking procedures. See 40 C.F.R. § 123.44 (1988), 40 C.F.R. §§ 124.6—124.15, 54 Fed. Reg. at 23,897 (to be codified at 40 C.F.R. § 123.46(e)). The EPA's denial or issuance of a NPDES permit or ICS under § 304($l$) is subject to judicial review by the court of appeals.

At least two Region IV states, Alabama and Georgia, have begun to implement new regulations based on the EPA policy statement. Both states have begun listing pulp and paper mills on § 304($l$) short lists. Following notice and comment procedures, Georgia adopted the EPA's suggested water quality standard for dioxin. Alabama is in the process of adopting more stringent water quality standards for dioxin. The adoption of more stringent water quality standards governing the discharge of dioxin requires the reopening of the mills' state-issued permits. At this time EPA has not reviewed any Region IV state's water quality standards regarding dioxin, nor any permit issued by a Region IV state regulating the discharge of dioxin by any of the plaintiffs nor any § 304($l$) short list of dioxin dischargers submitted by a Region IV state.

According to the testimony presented by the plaintiffs, some pulp and paper plants within Region IV have begun to implement changes to reduce the discharge of dioxin from their mills based on the Region IV guidance document. It is undisputed that any such changes will be costly. Thus far, the Court finds that no final action has been taken by any of the states which would require immediate implementation of more stringent dioxin controls.

## CONCLUSIONS OF LAW

API seeks to enjoin enforcement of the Region IV policy statement based on the fact that the EPA failed to follow rulemaking procedures established by the Administrative Procedures Act, 5 U.S.C. §§ 551–706. The EPA contends that API's motion for a preliminary injunction is due to be denied for three reasons. First, the document is not a final agency action and is not subject to the rulemaking procedures set forth in the Administrative Procedures Act; therefore, the Court lacks subject matter jurisdiction because there has been no final agency action. Next, EPA contends that this Court is precluded from litigating the issue of finality by the doctrine of collateral estoppel. Finally, according to EPA, the plaintiffs have failed to meet their burden of proof on the merits of the motion for a preliminary injunction. For the reasons stated below, the Court finds that the motion for preliminary injunction is due to be denied.

## JURISDICTION

Under the Administrative Procedures Act, 5 U.S.C. §§ 551–706, this court has the power to review "final agency action". 5 U.S.C. § 704. If the agency's action is not final, then this Court has no subject matter jurisdiction. According to EPA, the issue of finality has already been determined by the United States Court of Appeals for the Seventh Circuit in American Paper Institute v. E.P.A., and this Court is precluded from relitigating the issue by the doctrine of collateral estoppel. Alternatively, EPA argues that the Region IV policy statement is not a final agency action.

## COLLATERAL ESTOPPEL

The doctrine of collateral estoppel precludes the relitigation of an issue which was decided in a prior lawsuit. In order for collateral estoppel to apply, certain prerequisites must be met:

(1) the issue at stake must be identical to the one involved in the prior litigation, (2) the issue must have been actually litigated in the prior suit, (3) the determination

of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action, and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

*S.E.L. Maduro v. M/V Antonio De Gastaneta,* 833 F.2d 1477 (11th Cir.1987).

■ The Court is not convinced that all the elements necessary for the application of collateral estoppel are present in this case. First, the Court cannot say with certainty that the issue at stake in this action is *identical* to the issue involved in the prior litigation. Although both involve the finality of an EPA policy statement regarding dioxin, the policy statements apparently are not identical and were issued by different EPA regions.[3] Likewise, other than API, the parties against whom the issue is asserted were not parties to the prior action. The pulp and paper mills which are plaintiffs in this action were not involved in the prior action.[4]

## FINALITY

■ Having determined that collateral estoppel does not apply, the Court addresses the merits of the finality issue. In *FTC v. Standard Oil Company of California,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), the Supreme Court, relying on its earlier opinion in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), provided guidance for determining whether an agency action is final. Among the factors to be considered are: (1) whether the action is a definitive statement of the agency's position; (2) whether the action had the

status of law and immediate compliance with its terms was expected; (3) whether the action has a direct impact on the day-to-day business of the plaintiff; and (4) whether the preenforcement challenge was calculated to speed enforcement and prevent piecemeal litigation. *Id.*

■ Because the Court considers the first two criteria related, it will consider them together. The policy statement in this case is not a definitive statement precisely because it does not have the status of law and immediate compliance cannot reasonably be expected. This Court agrees with the Seventh Circuit's rationale in *American Paper Institute v. E.P.A.,* 882 F.2d 287 (7th Cir.1989):

> Until EPA puts polluters under the gun compelling them to do something they would rather not do, the 'final' agency action lies ahead.

*Id.* at 289.

The Region IV policy statement is not a definitive statement of the agency's position in the same sense that the regulation in *Abbott Laboratories* was definitive. In *Abbott Laboratories* the challenged regulation was promulgated in a formal manner after notice and comment. It was neither tentative nor informal, and the agency's counsel stated that immediate compliance was expected. In the case at hand, although the policy statement was published in the Federal Register, it was handled informally. The agency informally sent the proposed guidance to the states for comments. At no time has EPA indicated that compliance is mandatory. The document itself suggests certain limits regarding dioxin discharges. In his letter transmitting the policy statement to the Georgia Department of Natural Resources (DNR), the director of the Region IV Water

---

**3.** Neither party has supplied the Court with a copy of the Region V policy statement which is the subject of the Seventh Circuit opinion. However, both parties seem to agree that there are differences between the Region V and the Region IV approaches.

**4.** The defendant contends that the plaintiff mills were derivatively represented in the prior action by API, their trade association. In *Western Coal Traffic League v. ICC,* 735 F.2d 1408 (D.C.Dir.

1984), the court held that members of a trade association were estopped from relitigating an issue already litigated by their trade association in a prior action. However, that case differs from the case at hand since the same ICC regulation was at issue in both *Western Coal* and the prior action. In this case the API could not have adequately represented the interests of the Region IV mills in an action involving a Region V policy statement.

Management Division requested that Georgia DNR inform Region IV of its plans as soon as possible. (Plaintiffs' Exhibit "1").

Clearly, this policy statement does not have the status of law. Under the CWA's bifurcated regulatory scheme, the EPA does not directly regulate the mills within a state. Instead, the states are first given an opportunity to regulate those mills through water quality standards, NPDES permits, § 304(*l*) short lists, ICS's and the like. Because of this regulatory system the policy statement issued by Region IV is not binding upon anyone at this stage, and the states are under no obligation to comply. Granted the states may feel compelled to comply because EPA's "handwriting is on the wall," but that falls short, in the Court's judgment, of the finality criteria enunciated in *API v. E.P.A., supra.* The states may or may not choose to implement the Region IV suggestions in whole or in part. Under the CWA, EPA may not force the states to implement the policy it suggests. Instead, EPA may choose to disapprove state action on individual permits, water quality standards or short lists and substitute its own policies. Only at the point does the policy become final, and at that point EPA must follow rulemaking procedures.

Despite API's protests to the contrary, the EPA policy statement does not have a direct effect on the day-to-day business of either API or the plaintiff mills. Because EPA does not have the power to force compliance at this point, the plaintiffs are not being required by EPA to make any changes. There has been no *final* state action regarding dioxin discharges that would require immediate expenditures by the mills. According to plaintiffs any expenditures currently made by the mills in this regard are in anticipation of future action by the states and EPA based on the policy statement. The states may or may not adopt the limits suggested in the policy statement. Furthermore, at the time the issue reaches the EPA for review, EPA could also change its position.

The final issue the Court must consider in determining whether the action is final deals with the effect of pre-enforcement judicial review. If the Court granted the relief requested and required to EPA to follow rulemaking procedures before adopting the policy statement, piecemeal review of EPA's actions would be avoided. If the EPA does intervene in state-issued NPDES permits, water quality standards and ICS's, then its actions will be reviewed on a case-by-case basis. However, even if the court should enjoin EPA at this point, the states remain free to adopt the limits suggested by EPA which would subject the regulations to state court review.[5]

Most important to the Court in considering the effect of judicial review at this stage is the very structure of the CWA. Judicial action at this point would thwart the purposes of the CWA. Through that act Congress set up a system to give the states the first shot at regulating the discharge of pollutants into their waterways. However, Congress also placed the EPA in the position of overseer, to ensure that the states did not fail in their obligation to protect the nations rivers and streams. Court intervention at this point would essentially emasculate EPA by taking away its power to oversee state regulation.

Judicial review at this point would also adversely affect communication between EPA and the states. *Dow Chemical v. EPA,* 832 F.2d 319 (5th Cir.1987). EPA is empowered under the Administrative Procedures Act to issue nonbinding guidance to the states which is not subject to rulemaking procedures. 5 U.S.C. § 553(b)(3)(A). The effect of pre-enforcement review would be to discourage EPA from issuing guidance. The states would then be forced to make regulatory decisions subject to EPA review without any idea of EPA's position. It would also prevent EPA from sharing its expertise with the states for fear that its communication would be interpreted as final agency action.

Alternatively, API argues that, with regard to the finality issue, the Court need

---

5. According to testimony presented by the plaintiffs four of the states commented favorably on the EPA policy statement. *See* Plaintiff's Exhibit # 1.

look no further than the agency's action labeling the approach as final.[6] API relies on a letter from Bruce Barrett, Director of the Region IV Water Management Division, to the Georgia Department of Natural Resources. In that letter accompanying a copy of the policy statement at issue, Mr. Barrett refers to the Region IV guidance and states that he has enclosed "the final revised EPA–Region IV approach to regulation of dioxin discharges ..." (Plaintiffs' Exhibit 1).

The Court disagrees with API's contention that this "Region IV final approach label" is evidence of any intent by the agency to make the action final. The agency had previously sent a draft of the policy statement to the states for review. As the letter states, state comments were considered and incorporated, where possible into the guidance. Thus, "final" in this instance meant that it was no longer a draft version. Moreover, EPA's mere labeling of a policy statement as final does not make it final agency action. Instead, the factors set forth above must be considered by the Court to determine whether the effect of that statement is final.

Based on the foregoing, the Court finds that the policy statement issued by EPA is not final agency action. Under the Administrative Procedures Act the District Court has the power to review only "final agency action." Consequently, this Court lacks jurisdiction over this matter.

CONCLUSION

The motion for preliminary injunction is due to be denied because the Court lacks subject matter jurisdiction over this action. The EPA action which API would have the Court review is not a final agency action within the meaning of the Administrative Procedures Act and, therefore, is not subject to review. Because the Court lacks jurisdiction over this matter it is unneces-

sary to address the merits of the plaintiffs' motion for preliminary injunction. Accordingly, it is

ORDERED that the motion for a preliminary injunction is due to be, and hereby is, DENIED.

---

**6.** As support for the proposition API cites *Exxon Corp. v. Train,* 554 F.2d 1310 (5th Cir.1977). That case is not analogous to the case at hand. In *Exxon* the EPA issued a letter refusing to grant an adjudicatory hearing and stating that its action constituted final action. However, after Exxon filed suit, the EPA attempted to grant a hearing. EPA did not argue that its previous action was not final or that the court did not initially have jurisdiction. Instead, it attempted to take away the court's jurisdiction by granting the hearing which it had earlier denied. The Court held that EPA could not, by reversing its position, retroactively deprive an earlier action of finality.