**PENNSYLVANIA MUNICIPAL AU-
THORITIES ASSOCIATION, et
al., Plaintiffs,**

v.

**Marianne Lamont HORINKO,
et al., Defendants.**

No. CIV.A. 02–01361(HHK).

United States District Court,
District of Columbia.

Nov. 20, 2003.

96

John C. Hall, Hall & Associates, Washington, DC, for Plaintiff.

Alexandra Dapolito Dunn, Association of Metropolitan Sewerage Agencies, Washington, DC, David W. Burchmore, Squire, Sanders & Dempsey, L.L.P., Cleveland, OH, Scott T. Kragie, Squire, Sanders & Dempsey, L.L.P., Washington, DC, for Intervenor Plaintiff.

Eric G. Hostetler, Wendy Lynn Blake, United States Department of Justice, Washington, DC, Natalia Tania Sorgente, U.S. Department of Justice, Environmen-

tal Defense Section, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, Pennsylvania Municipal Authorities Association ("PMAA"), Tennessee Municipal League ("TML"), and The City of Little Rock Sanitary Sewer Committee ("Little Rock"), and plaintiff-intervenor, The Association of Metropolitan Sewerage Agencies ("AMSA"), bring this action against defendants Marianne Lamont Horinko, Acting Administrator of the United States Environmental Protection Agency ("EPA"), Donald S. Welsh, EPA Regional Administrator of Region III, J.I. Palmer, Jr., EPA Regional Administrator of Region IV, and Gregg Cooke, EPA Regional Administrator of Region VI claiming that the administrators of EPA Regions III, IV and VI have acted in excess of their authority under the Clean Water Act, 33 U.S.C. §§ 1251–1387. Plaintiffs maintain that the Regional Administrators, without opportunity for notice and comment, have issued guidance documents pertinent to certain water treatment and discharge processes which set more restrictive standards than required by the CWA or national rules promulgated by EPA. Plaintiffs contend that this violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and seek declaratory and injunctive relief.

Before this court is defendants' motion to dismiss [# 17] and plaintiffs' motion for a preliminary injunction and expedited hearing [# 51]. Upon consideration of the motions, the respective oppositions thereto, and the record of this case, the court concludes that defendants' motion to dismiss must be granted because this court lacks subject matter jurisdiction of this action.

## I. BACKGROUND

In passing the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251–1387, Congress established a comprehensive regulatory scheme to control the discharge of waste and pollutants into the nation's navigable waters. The Act's objective is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act makes unlawful any pollutant discharges into navigable waters, except as authorized by other provisions of the CWA, 33 U.S.C. §§ 1311(a), 1342, and requires the promulgation of effluent limitations which set the maximum allowable quantities, rates and concentrations of different pollutants that "point sources" may discharge into waters. 33 U.S.C. § 1362(11). Point sources are simply "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The EPA enforces the CWA through the National Pollutant Discharge Elimination System ("NPDES"). Under this system, the EPA has the discretion to issue permits for the discharge of otherwise prohibited pollutants, after a public hearing and subject to conditions set by the Administrator. 33 U.S.C. § 1342(a)(1). The Administrator may also authorize states to establish their own permit programs, which must conform with federal requirements. *See* 33 U.S.C. §§ 1314(i), 1342(b). EPA has authorized forty-five states, including the states where plaintiffs are located, to issue permits. Permits in the remaining states are issued by EPA itself. Authorized states must issue NPDES permits in accord with the provisions of the CWA and are subject to EPA oversight. 33 U.S.C. § 1342(b)-(c). Specifically, within ninety days after a state issues an NPDES permit, the EPA Administrator,

or EPA regional administrator, may object in writing to an issued permit, rendering it invalid. *See* 33 U.S.C. § 1342(d)(2); 40 C.F.R § 123.44. Under the Clean Water Act's judicial review provision, parties affected by EPA actions may appeal to the Circuit Courts of Appeals.[1]

Plaintiffs represent, in total, hundreds of municipalities holding NPDES permits for their public-owned treatment works ("POTWs"). EPA regulations define POTWs as "any devices and systems used in the storage, treatment, recycling and reclamation of municipal sewage or industrial wastes of a liquid nature." 40 C.F.R. § 403.3(*o*). Plaintiffs claim that the regional EPA administrators have imposed restrictions and limitations on NPDES permitting not mandated by the provisions of the CWA and in contravention of "longstanding" national EPA rules. Specifically, they assert that the EPA regional administrators have put limits on various processes in various policy statements that are contrary to those indicated in existing national policy statements or rules, without any opportunity for notice and comment. The policy statements pertain to three different practices that are at issue in this case: "blending," emergency sanitary sewer overflows discharges, and the application of secondary treatment to emergency overflows.

## A. "Blending" and "Bypass"

First, plaintiffs allege that EPA Regions III, IV and VI, contrary to national EPA rules, prohibit "blending." Compl. at 29–39. They define "blending" (also "slip-streaming" or "recombination") as a practice used when peak wet weather flows (*e.g.,* from floods or massive rainfall) exceed the capacity of a treatment unit, and as a result, permittees route excess flows around the unit and mix or recombine them with treated waters. The combined waters, at the point of final discharge into navigable waters, ideally meet the effluent limitations contained in a given permit.

Defendants indicate that "blending" is not a term contained in the CWA or NPDES regulations but instead implicates a practice called "bypass." EPA regulations generally prohibit bypass, but a given bypass may be approved if it does not result in effluent limitations being exceeded and if it is essential for efficient operation. 40 C.F.R §§ 122.41(m)(2), (4). In addition, EPA may not bring an enforcement action if a bypass is (1) unavoidable to prevent death, personal injury, or severe property damage; (2) necessary for lack of feasible alternatives; and (3) is preceded by advance notice. 40 C.F.R § 122.41(m)(4). Furthermore, EPA regulations provide for an "upset" defense, which excuses noncompliance with effluent limitations by permittees because of exceptional incidents leading to unintentional and temporary effluent discharges. 40 C.F.R. § 122.41(n)(1).

Plaintiffs claim that EPA has had a long-standing policy that it would not dictate the precise processes to be used, so long as the POTWs meet their effluent limitations: "No final EPA rule or Headquarters policy requires that in order for a

---

1. See 33 U.S.C. § 1369(b)(1). The following portions are relevant to the present action: Review of the Administrator's action ... (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title[ or] (F) in issuing or denying any permit under section 1342 of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial ....

POTW to legally blend, blending must be specifically referenced in the permit." Compl. at 14. Plaintiffs argue that without recourse to blending, POTWs must force all waters to flow through the treatment facilities, which will in turn compromise the effectiveness of the treatment units and may make them exceed their effluent limitations. According to plaintiffs, the prohibition by regional EPA administrators on bypass and other similar processes changes would require prohibitively expensive changes to the design of treatment plants. *Id.* at 27 (estimating total costs of over $200 million for named plaintiffs, and billions of dollars for all POTWs nationwide, to conform with a complete ban on blending).

**B. Sanitary Sewer Overflow Discharges**

Second, plaintiffs claim that EPA Regions III and IV, contrary to national EPA rules, refuse to permit emergency sanitary sewer overflow ("SSO") discharges. Plaintiffs define "emergency outflows" as discharges from sanitary sewer overflow points-places where sewage is collected (*e.g.,* a pump station) before entering a treatment works. Generally, the CWA prohibits non-emergency SSO discharges. Emergency outfalls, like "blending," are said to be needed in times of high precipitation, when a POTW's treatment facilities are overtaxed or overflowing. As a result, plaintiffs claim, emergency discharges should be allowed under the bypass and upset defenses. Plaintiffs assert, however, that EPA Regions III and IV have prohibited the permitting of outfalls entirely, meaning that the bypass and upset defenses are not available at all, and that even emergency SSO discharges would subject plaintiffs to liability. Plaintiffs argue that such rules are *ultra vires,* and that the national EPA regulations do not prohibit emergency outfalls. Defendants, for their part, assert that "emergency outfall," like

"blending," is not a term recognized by the EPA.

**C. Secondary Treatment**

Finally, plaintiffs claim that EPA Regions III and IV have, contrary to EPA regulations, established "secondary treatment" as the technology-based standard for SSO discharges to be permittable. This allegation is a corollary to the previous claim-since EPA Regions III and IV do not permit emergency SSO overflows (of untreated effluent), SSO discharges must receive some sort of treatment. Plaintiffs concede that EPA regulations require that "secondary treatment" standards apply to discharges from treatment plants themselves. However, they claim that sewage overflow points are not part of treatment works and that SSOs are not subject to "secondary treatment." *Id.*

All of these alleged prohibitions and *ultra vires* regulations, according to plaintiffs, appeared in the form of dictates by regional administrators for EPA Regions III, IV and VI. In addition, other EPA Regions (II, V, VII, and IX) have explicitly approved of blending. Furthermore, departments within the national EPA disagree over the legality of blending and emergency outfalls. *See* Pls.' Ex. 21 (Letter from Tinka G. Hyde, Acting Direct of EPA Water Division) (indicating EPA's Office of General Counsel, Office of Water and Office of Wastewater Management agreement that permits could, under certain circumstances, authorize re-routing or recombination "without ... being consider a 'bypass' "); Pls.' Ex. 52 (email from Kevin Weiss, EPA Office of Wastewater Management, Apr. 16, 2001) (indicating that Office of Enforcement and Compliance Assurance intended to oppose the view of other departments on blending). Plaintiffs argue that the long-standing position of EPA Headquarters is that all of these

processes are allowable.[2] *See* Compl. at 24–27 (alleging that national EPA guidelines allow blending); 42 (claiming that national EPA rules have never prohibited permitting of emergency outflows); 46 (asserting that national EPA rules apply a "best available technology" or "best conventional pollutant control technology," to SSOs and that in 2000, non-binding EPA guidelines began to apply secondary treatment standards to SSOs). The national EPA is aware of the conflict between different Regions on blending and SSOs and has agreed that blending and emergency outfalls can be permitted. Compl. at 48 (noting that plaintiffs have met with EPA Headquarters over the last three years, and that EPA Headquarters has "consistently agreed" that blending and emergency outflows can be permitted under NPDES). However, plaintiffs claim that EPA Headquarters has done nothing to prevent Regions III, IV and VI from prohibiting blending and emergency outfalls.

For the most part, in representing hundreds of POTWs and municipalities, plaintiffs allege prospective harms. *See* Compl. at 6 ("Failure of PMAA members to adjust their conduct to the mandates of EPA Region III will have legal consequences."), 8 ("SSO discharges by TML members will need to be eliminated"), 9 ("Little Rock will need to expend significant sums in order to eliminate blending"). However, some municipalities have faced real, concrete harms. Specifically, some states have refused to reissue permits in order to comply with the EPA regional guidance documents banning blending.[3] Other states, also following regional EPA documents, have included the prohibitions on blending in their NPDES permits when such bans did not exist before.[4] Finally, in some instances, EPA regions have intervened directly and objected to state-issued permits that allowed blending.[5] These

2. All three disputed processes are related in that they all involve restrictions on the ability of POTWs to manage "wet-weather" events-that is, events involving high volumes of precipitation that overtax the collection and processing capacity of POTWs. Blending and emergency outflows allegedly allow POTWs to cope with wet-weather events, albeit in different ways, without exceeding effluent limits contained in NPDES permits, overtaxing processing facilities, or forcing municipalities to redesign their POTWs and intake centers.

3. *See* Decl. of John Brosious at 2–3 (noting the general refusal of Pennsylvania authorities to reissue permits which once allowed blending "because of uncertainties regard the legality of this wet weather flow management practice" and that some permits "expired several years ago."); Decl. of Raymond A. Dami (indicating that a POTW's permit expired two years ago and that Pennsylvania authorities refuse to reissue because they purport to follow EPA Region III's dictate against blending).

4. Decl. of Gordon L. Bloom at 2 (noting that Pennsylvania authorities, based on EPA Region III's declaration, issued permit banning blending, and that POTW had to appeal its state-issued NPDES permit); Decl. of John H. Graham, Jr. at 2–3 (stating that recently reissued Tennessee permits ban blending because of Region IV's dictates); Pls.' Ex. 1 at 6 (Memo. of Richard Wooster, no date) (explaining that Region VI notified six Texas POTWs that "bypass" of waste water from treatment process was generally prohibited and that Region VI's enforcement staff would follow up and ensure compliance with permit bans on bypass).

5. Decl. of Reggie A. Corbitt at 2 (noting that Arkansas authorities approved blending in permit for Little Rock's POTW, but that EPA Region VI objected to the draft permit and thereafter, Arkansas would not permit blending); Pls.' Ex 6 (Letter of EPA Region IV to Alton Boozer) (objecting to South Carolina's issuance of permit to POTW that employed blending); Pls.' Ex. 16 (Letter of Milton H. Hamilton, Jr., Aug. 29, 2000) (indicating to TML that Tennessee's position on bypass was previously flexible but that "EPA has given very direct instruction ... prohibit[ing] bypass of any portion of a treatment facility other than for essential maintenance" and that Tennessee would not "force resolution of

permitting decisions all involved blending, not emergency outflows or secondary treatment applied to SSO discharges. Plaintiffs do not indicate how many POTWs face concrete action by state permitting agencies or EPA Regional administrators.

## II. ANALYSIS

Plaintiffs suggest that the court should address their preliminary injunction before resolving defendants' jurisdictional arguments, which they claim "have nothing to do" with the substantive claims contained in the motion for preliminary injunction. Despite its asserted urgency, however, plaintiffs' preliminary injunction motion does not take priority over defendants' motion to dismiss for lack of jurisdiction. Jurisdiction, of course, is a threshold matter; without it, this court has no authority to decide other potentially dispositive issues in this case. *See Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 757 (D.C.Cir.1987) (Green, J., concurring) (holding that "lower courts must always wrestle with [jurisdictional issues] before reaching any questions of justiciability, since courts may not decide issues over which they lack jurisdiction"); *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C.Cir.1981) ("The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds."); *Am. Farm Bureau v. EPA*, 121 F.Supp.2d 84, 91 (D.D.C.2000) ("The court must address the issue of jurisdiction as a threshold matter, because absent jurisdiction the court lacks the authority to decide the case on any other grounds."). Therefore, the court must consider jurisdictional issues raised by defendants before considering plaintiff's preliminary injunction.

### A. Motion to Dismiss Standard

■ A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Commun. Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *Beverly Enters., Inc. v. Herman*, 50 F.Supp.2d 7, 11 (D.D.C. 1999). At the stage of litigation when dismissal is sought, the plaintiffs' complaint must be construed liberally, and the plaintiffs should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997). However, unlike the limited matters that appropriately can be considered when addressing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), in resolving a motion

pending permit appeals"); Pls.' Ex. 24 (Email by Roosevelt Childress, EPA Region IV, May 11, 2002) (explaining that Region IV objected in March 2002 to two Alabama draft permits that proposed to allow blending, was preparing to object to draft permit in South Carolina, and would not change its position); Pls.' Ex. 26 (Letter from EPA Region VI to Maryala Nastrzobski, March 3, 2003) (providing reasons for Region VI's objection to Arkansas-based POTW's permit, namely that blending allowed in permit did not meet bypass standards under 40 C.F.R. § 122.41(m)); Pls.' Ex. 29 (Letter from Douglas F. Munrick, EPA Region IV, to Roger D. Lemasters, March 01, 2000) (explaining why draft permit for Tennessee POTW allowing blending did not meet bypass regulations); Pls.' Ex. 31 (Email from Roosevelt Childress, EPA Region IV, to Kevin Weiss, EPA headquarters, Aug. 22, 2002) (noting EPA Region IV's objection to permits allowing blending in Alabama and Region IV's advice to Alabama authorities to instruct the POTW that its options were to have peak flows comply with secondary treatment standards before blending or report discharges as upsets or bypasses and for Alabama to use its enforcement discretion); Pls. Ex. 34 (Letters from EPA Region III to Steven Beckman, Pennsylvania Dep't of Envtl. Protection) (reproducing Region III objection letters from 1996 to permits allowing blending).

to dismiss under Rule 12(b)(1), a court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case. *Artis v. Greenspan,* 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction."). In spite of the favorable inferences the plaintiffs receive on a motion to dismiss, it is still the plaintiffs' burden to prove jurisdiction. *See Am. Farm Bureau,* 121 F.Supp.2d at 90.

## B. Final Agency Action

Plaintiffs claim federal question jurisdiction under the APA, which provides judicial review over "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Specifically, plaintiffs assert jurisdiction under the latter clause because "EPA final agency action is involved for which there is no adequate remedy in court." Compl. at 5; *see also* Pls.' Opp'n to Defs.' Mot. to Dismiss at 22. Defendants assert that no final agency action is involved and, therefore, that the challenged guidance documents are not reviewable at all. Defendants also claim that even if final agency actions were involved, they fall under CWA jurisdictional provisions, § 1369(b)(1)(E)-(F), which vest judicial review exclusively in the Circuit Courts of Appeals.

The court's jurisdictional analysis begins with an assessment of whether defendants' actions constitute final agency action under 5 U.S.C. § 704. Finality is a threshold matter because if plaintiffs fail to establish it, neither the district courts nor the courts of appeals have jurisdiction over the present action. *See Appalachian Energy Group v. EPA,* 33 F.3d 319, 322 (4th Cir. 1994) (noting that the court of appeals

reviews actions under 33 U.S.C. § 1369(b)(1) only if they constitute final agency action). If plaintiffs establish final agency action, however, they must then also establish that the court of appeals does not have jurisdiction over this case under Section 1369(b)(1). The court now turns to an analysis of whether there has been final agency action.

■ The Supreme Court has established a two-prong test for determining whether agency action is final: First, it "must mark the 'consummation' of the agency's decision making process" and not be "merely tentative or interlocutory" in nature; second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations and quotations omitted).

One problem in analyzing whether the actions that are the subject of this suit are final is that not all of the POTWs plaintiffs represent are similarly situated. According to plaintiffs, some POTWs suffer the consequences of EPA Regional dictates now, and presumably the others will suffer consequences later. *See* Compl. at 6 ("Members of PMAA are adversely impacted and will be adversely impacted by EPA Region's III's mandate"), 8 ("Members of TML are adversely impacted and will be adversely impacted by EPA Region's IV's mandate"), 9 ("EPA Region VI has told Little Rock that blending is illegal"). In affidavits and exhibits uncontroverted by defendants, plaintiffs identify POTWs that have had permits expire without renewal, states refusing to issue permits based on the regional guidance documents, and EPA Regional Administrators objecting to state-issued permits. *See supra* notes 3–5. Living in fear of having a permit denied is different from actually

having that permit denied. The court must analyze separately the finality of (1) the regional guidance documents themselves and (2) permit activity prohibiting blending.

### 1. Regional Guidance Documents

■ Plaintiffs claim that *regional* EPA guidance documents constitute "final agency action" and are, therefore, reviewable. Clearly, *national* guidance documents by federal agencies can constitute final agency action. In *Bennett v. Spear*, the Supreme Court held that under the APA, "final agency action" did not only constitute formal rule promulgation, but could also include the issuance of guidance documents by a federal agency. *Spear*, 520 U.S. at 178, 117 S.Ct. 1154 (finding that a biological opinion, analyzing the effect of an irrigation plan on an endangered species, issued by the Fish and Wildlife Service constituted "final agency action" because it had "direct and appreciable legal consequences" in the context in which it was issued and did not merely fulfill an advisory or recommendatory function). *Spear*'s two-part analysis inquires, first, whether a guidance document represents the "consummation" of the federal agency's decision making process and, second, whether the document determines rights or obligations or creates legal consequences. *Id.* at 177–78, 117 S.Ct. 1154.

In the D.C. Circuit, it is well-settled that, under the *Spear* test, the EPA's *national* guidance documents can constitute final agency action. *See Croplife Am. v. EPA*, 329 F.3d 876, 883 (D.C.Cir.2003) (finding that a national EPA press release constituted final agency action); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C.Cir. 2002) (finding a national guidance document to be final agency action); *Barrick Goldstrike Mines v. Browner*, 215 F.3d 45, 47 (D.C.Cir.2000) (same); *Appalachian Power v. EPA*, 208 F.3d 1021, 1023 (D.C.Cir.2000) (noting that "if an agency

acts as if a document *issued at headquarters* is controlling in the field" that a court *can* find final agency action) (emphasis added). Whether a national guidance document constitutes final agency action, therefore, has usually been a highly fact-specific determination.

However, plaintiffs do not claim that they are challenging national EPA guidelines. They cite cases, such as *CropLife America* and *General Electric*, to support the proposition that *regional* EPA guidance documents (*i.e.*, those issued by regional EPA administrator governing several states) can be final agency action. The D.C. Circuit has not directly addressed this issue. Decisions in cases decided by sister circuits do address this issue head-on, holding that, under *Spear*, regional EPA guidance documents on NPDES permits do not constitute final agency action.

In *American Paper Institute, Inc. v. EPA*, 882 F.2d 287 (7th Cir.1989), the Seventh Circuit held, in a case similar to the present action, that an EPA regional guidance document on NPDES permits, which suggested more onerous standards than those in national EPA documents, did not constitute "final agency action" and therefore was not reviewable. *See id.* at 289. The *American Paper* court noted that it was natural that permittees "pay substantial attention to the EPA's policy statements and other documents published for guidance, even though these lack legally binding effect." 882 F.2d at 288. However, that court found the review sought by worried permit applicants in *American Paper* based on such documents premature because "telegraphing your punches is not the same as delivering them." *Id.* at 289. Especially when the EPA may subject state-issued permits to a veto, permittees (in *American Paper*, plaintiff-paper mills challenging guidance documents of EPA Region V) can not, and need not,

immediately challenge regional guidance documents in federal court because such documents do not represent the "consummation" of the rule making process. The Seventh Circuit in *American Paper* states,

> Every permit holder may proceed under the authority of its existing permit, without regard to Region V's suggestions. If states heed the suggestions to the detriment of paper mills, review is possible in state court. If states propose a course of action inconsistent with Region V's wishes, the Administrator may overrule Region V. If the Administrator adopts Region V's position and a permit is turned down, modified, or rescinded, review will be available in state or federal court. That review, on a full record, will disclose the EPA's final position, as applied to the plant in question.

*Id.* Furthermore, there are compelling policy reasons against pre-enforcement review of EPA guidance documents, even national ones. Such review would discourage EPA from issuing guidance and sharing expertise with states "for fear that its communication would be interpreted as final agency action," and states "would then be forced to make regulatory decisions subject to EPA review without any idea of EPA's position." *Am. Paper Inst., Inc. v. EPA*, 726 F.Supp. 1256, 1260 (S.D.Ala. 1989).

The *American Paper* position has support in other circuits. *See Appalachian Energy Group v. EPA*, 33 F.3d 319, 322 (4th Cir.1994) (citing *American Paper* approvingly for the proposition that region guidance documents were not reviewable, and that only denial or modification of a NPDES permit was reviewable); *City of San Diego v. Whitman*, 242 F.3d 1097, 1101–02 (finding that a policy statement by EPA Region IX on NPDES permits did not constitute "final agency action," even when the document involved input by the national EPA's Office of General Counsel). Furthermore, at least one D.C. Circuit

case has adopted the *American Paper* approach, but outside the context of NPDES permits. *See Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1396 (D.C.Cir.1991) ("Neither the representations of subordinate officials nor the instigation of enforcement proceedings constitutes final agency action for the purpose of judicial review.") (citing *American Paper*, 882 F.2d at 288).

It does not matter that EPA Headquarters has delegated authority to regional administrators. In general terms, EPA Regions have the delegated power to issue or deny permits, in states without permitting programs, and to oversee permits issued by states with NPDES programs. *See* EPA Delegations Manual 2–20 (delegating to states authority to issue NPDES permits), 2–21 (delegating authority to EPA Regions to oversee state permitting programs). Such delegation makes certain regional EPA actions final for the purposes of Section 704. However, both plaintiffs and defendants agree that the EPA Regions do not have authority to establish rules prohibiting the disputed practices. *See* Pls.' Mot. for Prelim. Inj. at 24 ("It is clear that the EPA Regions do not have the authority to promulgate rules under the CWA"); Pls.' Ex. 11 (Defs.' Admission 72) ("EPA admits that EPA Regional Administrators have not been delegated the authority ... to establish rules of national applicability under the Clean Water Act."). The EPA Delegations Manual indicates that the EPA Regions lack the authority to impose rules or standards more restrictive than those of the national EPA. *See* Pls.' Mot. for Prelim. Inj. at 24 (citing EPA Delegations Manual 1–21.2a(1), which authorizes EPA Regions to "make nonsubstantive changes to previously published documents [and] amend or change regulations without affecting their stringency, applicability, burden of compliance, or compliance costs.").

As a result, a regional guidance document only becomes "final agency action" if the EPA Administrator affirmatively adopts it.

There is, therefore, no final agency action for POTWs complaining only of prohibitions contained in regional guidance documents. Until something more happens to them (*e.g.,* permit denials or a national EPA guidance document satisfying *Spear* ), these municipalities can not claim final agency action by the EPA and, therefore, no federal court, district or appellate, has jurisdiction over their claims. But because, as *American Paper* suggests, regional guidance documents are not binding, these POTWs may continue to operate under the authority of their current permits until they expire, or are challenged by state or federal permitting authorities. *See* 882 F.2d at 289. Dismissal of the claims of these POTWs does not preclude them from bringing future actions when and if they suffer more concrete harms. The court now turns to the claims of POTWs who have allegedly suffered more concrete harms.

### 2. *Permit Activity*

█ In general, EPA objections or modifications to permits have been found to be final agency action. *See Crown Simpson Pulp Co. v. Costle,* 445 U.S. 193, 196, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980) (accepting, implicitly, EPA Region X's objection to state-issuance of a permit as final agency action). Defendants essentially concede that the denial of an NPDES permit, objection to a state-issued permit, or the issuance of a state permit with certain modifications (*e.g.,* new prohibitions on blending) would constitute final agency action:

> Rights and obligations related to a particular POTW's proposed discharges of sewage are determined when in a particular permit adjudication, EPA or an authorized State either denies an NPDES permit, or issues the permit with any

appropriate conditions. . . . Until issuance of an NPDES permit setting a fixed effective date for compliance, and imposing specific conditions on discharge, a POTW need not take action to meet those conditions.

*See* EPA's Opp'n to PMAA's Motion for Prelim Inj. Relief ("Defs.' Opp'n to Prelim. Inj.") at 17.

It does not matter, for purposes of analyzing "final agency action," that the national EPA apparently never prevented EPA Regions III, IV and VI from objecting to permits and never prevented states from refusing to issue permits. The EPA Regions have been delegated the authority to oversee state permitting programs, including the discretion whether or not to object to a permit. *See* EPA Delegation Manual 2–21 (delegating authority to EPA Regions to oversee state permitting programs). The national EPA's silence on a regional guidance document is simply different from its silence on a regional permitting decision. Silence by EPA Headquarters with regard to the regional guidance documents has no immediate legal effect-such silence can not be read as an adoption or repudiation of the regional guidelines.

Here, there is conflict between different EPA Regions and disagreements within national EPA itself on the permissibility of blending and other processes. Silence on regional guidance documents, while EPA is in the midst of attempting to formulate a national policy process, can not, without more evidence, be construed as approval or disapproval. Though plaintiffs complain that EPA's delay in formulating a national policy has given rise to this action, they point to no statutory deadline for EPA to act on the regional rules. Silence by EPA Headquarters with regard to particular permitting decisions, however, has real consequences. The EPA has ninety

days, after receiving notice of the issuance of a state permit, either to object to state permits (prohibiting blending or emergency outflows) or to overrule an EPA Region's objection to a state permit (allowing blending or emergency overflows). *See* 33 U.S.C. § 1342(d)(2). Silence validates a state-issued permit or an EPA regional permit veto and is the last word of the national EPA with regard to a particular permit.

As a result, the permit denials or modifications by the EPA Regions satisfy the *Spear* test. Under *Spear*'s first prong, permit issuance or denial marks the " 'consummation' of the agency's decision making process" with regard to a particular POTW or municipality. Once the ninety day time limit for EPA objection has passed, a POTW knows whether or not the EPA will allow a state's permitting decision to stand; after ninety days, the EPA has nothing more to say about a particular permit. Under the second prong of *Spear*, the alleged permit objections or denials do determine legal "rights or obligations" for the POTWs. POTWs need NPDES permits to legally operate and, without them, they are subject to enforcement actions and compliance deadlines. Defendants claim that there is no "final agency action" until the EPA brings an enforcement action in federal district court and that, so far, EPA has not brought enforcement proceedings against any of the plaintiffs. While an EPA enforcement action certainly would be probative, case law does not require such action in order to find final agency action. Therefore, municipalities denied permits by states or the EPA Regions, or issued permits banning blending, suffer enough tangible legal injury under *Spear* to claim judicially reviewable "final agency action."

## C. District Court Jurisdiction

Because permit activity constitutes final agency action, plaintiffs' surviving claims are subject to another jurisdictional analysis-whether or not judicial review of this matter is vested with the district court. Two APA provisions are relevant. First, the jurisdictional provision of the APA invoked by plaintiffs confers jurisdiction on the federal courts only over matters that involve "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. That is, district court jurisdiction in Clean Water Act cases is residual; if another court may review agency actions, the district court may not. In particular, the Courts of Appeals have exclusive jurisdiction to review matters specifically enumerated in Section 1369(b)(1). Second, the APA precludes review of any agency actions, though possibly final, "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The court considers Court of Appeals jurisdiction and agency discretion in turn.

### 1. Court of Appeals Jurisdiction

Section 1369(b)(1) confers exclusive jurisdiction upon the Circuit Court of Appeals for the violations of specifically enumerated CWA provisions involving the "Administrator's action." Of particular relevance to plaintiffs' remaining permitting activity claims, Section 1369(b)(1)(F) provides for exclusive court of appeals review over "the Administrator's action ... in issuing or denying any [NPDES] permit." 33 U.S.C. § 1369(b)(1)(F). For the purposes of judicial review, EPA regulations indicate that the "Administrator" means "the Administrator or any official exercising authority delegated by the Administrator." 40 C.F.R § 23.1(b). The EPA Regions have been delegated the power to make objections to state-issued permits. EPA Delegations Manual 2–21 (delegating authority "[t]o receive copies to [*sic*] permit applications ... from States and to object in writing to the issu-

ances of permits ... of the Clean Water Act").

It is well-settled that EPA objections to state-issued permits fall under Section 1369(b)(1)(F). In *Costle,* the Supreme Court held that the Court of Appeals had exclusive jurisdiction under § 1369(b)(1)(F) over an EPA Regional Administrator's objection to a state-issued NPDES permit. *See* 445 U.S. at 196–97, 100 S.Ct. 1093. The issue in *Costle* was whether Section 1369(b)(1)(F) should be read literally to apply only to EPA-issued permits and not state-issued permits. The Court refused to accept the literal reading because to do so would make permit denials "reviewable at different levels of the federal-court system depending on the fortuitous circumstance of whether the State in which the case arose was or was not authorized to issue permits" and that Congress did not apparently intend to "creat[e] such a seemingly irrational bifurcated system." *Id; see also Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.,* 266 F.Supp.2d 1101, 1113 (N.D.Cal.2003) ("The Supreme Court has made clear that circuit court jurisdiction under [§ 1369(b)(1)(F)] extends to actions that are functionally equivalent to issuing or denying a permit."). In addition, *Costle* accepted, implicitly, a lower court's characterization of regional EPA objections to permits as "Administrator's action." *See* 445 U.S. at 194, 100 S.Ct. 1093; *Crown Simpson Pulp Co. v. Costle,* 599 F.2d 897, 899 n. 1 (9th Cir.1979), *rev'd on other grounds, Costle,* 445 U.S. 193, 100 S.Ct. 1093 (1980) (attributing, explicitly, EPA Region IX's permit veto to the Administrator based on delegation in 40 C.F.R §§ 125.5(a)(4), 125.5(c)). The one D.C. Circuit case to address the issue, in dicta, observed that the federal appellate courts have jurisdiction to review EPA vetoes of state permitting decisions. *See Dist. of Columbia v. Schramm,* 631 F.2d 854, 859 (D.C.Cir.1980) ("Federal courts clearly may review Agency vetoes of state NPDES decisions.") (citing 33 U.S.C. § 1369(b)(1)(F) and *Costle,* 445 U.S. at 196, 100 S.Ct. 1093).

In this case, plaintiffs complain of three types of permitting activity: (1) state-issued permits approving blending that were later objected to by the EPA Regions; (2) state regions refusing to reissue permits; (3) state regions issuing permits with prohibitions on blending. Under *Costle,* those claims in the first category involving EPA Regional objections to state permits are within the exclusive jurisdiction of the Court of Appeals and cannot be heard by this district court. Furthermore, the statute of limitations has run for claims based on EPA objections to permits issued more than 120 days before the filing of plaintiffs' claims those claims and must be dismissed with prejudice. *See* 33 U.S.C. § 1369(b) (indicating that application for judicial review by the courts of appeals "shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial ..."). However, *Costle* does not deal directly with judicial review over state permitting decisions on which the EPA is silent. *Costle* only purported to deal with active EPA objections to state permits. Using noncommittal language, the Supreme Court, in *dicta,* suggests that inaction or silence by the EPA (*i.e.,* no objection to a state-issued permit) does not constitute "Administrator's action." *See* 445 U.S. at 197 n. 9, 100 S.Ct. 1093 ("EPA's failure to object, as opposed to the affirmative veto of a state-issued permit, *would not necessarily* amount to 'Administrator's action' within the meaning of [§ 1369(b)(1)]") (emphasis added). This suggests, under Section 1369(b)(1)(F), that state permitting decision not vetoed by the Administrator would be subject to district court review.

Plaintiffs cite cases suggesting a narrow interpretation of "Administrator's action"

under Section 1369(b)(1)(F), such as to preclude Court of Appeals jurisdiction in this case. *See* Pls.' Opp'n at 18–19 (citing *Mianus River Pres. Ctte. v. EPA*, 541 F.2d 899, 902–03 (2d Cir.1976); *So. Holland Metal Finishing Co. v. Browner*, 97 F.3d 932, 936 (7th Cir.1996); *California v. Reilly*, 750 F.Supp. 433, 436 (E.D.Cal.1990)); Pls.' Mot. to Supp. Response to Defs.' Mot. to Dismiss (citing *Friends of the Earth v. EPA*, 333 F.3d 184 (D.C.Cir.2003); *United States v. So. Indiana Gas & Elec. Co.*, 2002 WL 31427523 (S.D.Ind. Oct.24, 2002)).

■ Most of these cases are inapposite,[6] but one case merits discussion. In *Mianus River*, the Second Circuit held that the EPA's silence on state-issued permits did not constitute "Administrator's action," *see* 541 F.2d at 909–10, and read Section 1369(b)(1)(F) literally as "clearly specify[ing] review of only the 'Administrator's action"' and leaving "unmentioned the review status of permits issued or denied by one other than the Administrator." *Id.* at 902. The Second Circuit found that Congress, in drafting the CWA, "did not in-

tend to relegate the States to the status of enforcement agents for the executive branch" but that it "clearly intended [the Administrator's] role with respect to individual State permits to be passive on the whole."[7] *See id.* at 906, 908. With little other case law on point, this court concludes that the Court of Appeals does not have jurisdiction under Section 1369(b)(1)(F) over claims involving EPA silence on state permitting decisions.

### 2. Agency Discretion

■ While case law suggests that under § 1369(b)(1)(F) the district court has jurisdiction over plaintiffs' remaining claims, one final analysis is necessary. The APA precludes review of any agency actions, "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), though they may constitute "final agency action" and may otherwise be reviewed by district courts. *Mianus River* raised agency discretion as an issue, citing it as a rationale to deny the jurisdiction of the Court of Appeals. One of the reasons the Second Circuit found

---

**6.** In *South Holland Metal Finishing Co.*, the Seventh Circuit said bluntly that under section 1369(b)(1), "Region V is not the 'Administrator' of the EPA." However, this case simply followed *American Paper* because it involved alleged regional EPA rule interpretation, not permit denial or silence on a state-issued permit. The Seventh Circuit concluded that the EPA Region's actions also did not constitute final agency action. *See* 97 F.3d at 936. In *California v. Reilly*, a district court found that it had jurisdiction over the EPA's refusal to enforce pesticide regulations under the Food, Drug and Cosmetic Act. *See* 750 F.Supp. at 436. The case did not involve the CWA, an analysis of "Administrator's action" under the APA, or NPDES permits. In *Friends of the Earth*, the plaintiffs challenged an alleged national EPA rule-promulgation under 33 U.S.C. § 1313. *See* 333 F.3d at 187. The D.C. Circuit dismissed the case for lack of jurisdiction and remanded the case to the district court because § 1313 was not specifically enumerated as reviewable by the Court of Appeals in

33 U.S.C. § 1369(b)(1). *Id.* at 193. The case never mentions "Administrator's action." *Southern Indiana Gas & Electric*, which analyzed analogous jurisdictional provisions of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, also involved challenges to rule interpretation, not permit denial. That district court held that it had jurisdiction over questions "never officially promulgated by the Administrator." *Id.* at *6. However, that court also found that EPA had not promulgated a new "rule" at all and, thus, could not offer those who challenged the rule any relief. *See id.* at *10.

**7.** *Mianus River* cites an early draft of the CWA which gave the Administrator the responsibility of approving all state-issued permits. It further explains that the final draft removed the duty to review each permit and instead gave states the maximum amount of responsibility over NPDES permitting and allowed the EPA to intervene when states did not carry out their obligations. *See* 541 F.2d at 908.

EPA silence on state permitting decisions not reviewable was that "the option to take no action, even when a permit does not conform, is committed to the Administrator's almost unfettered discretion." 541 F.2d at 909 n. 24. Furthermore, that court also reasoned that because state-issued NPDES permits often would be based upon state law (free to impose more stringent standards than the CWA's), a federal court would be forced to "review issues involving only a State agency's application and interpretation of purely state law." *Id.* at 906. The *Mianus River* court did not have before it district court jurisdiction as an alternative; neither did the Second Circuit remand the case for district court consideration. Nevertheless, the reasoning in the case suggested no federal jurisdiction at all over state permitting actions on which the EPA remains silent.

 The one case in this circuit to have confronted the issue of EPA silence on state-issued permits entirely repudiated federal jurisdiction-district or appellate court. The D.C. Circuit found that while EPA vetoes of state permits were subject to review by the Courts of Appeals, the Administrator's decision not to object to a permit was committed to agency discretion by law under the APA, 5 U.S.C. § 701(a)(2), and was therefore not reviewable at all. *See Schramm,* 631 F.2d at 859, 861. The opinion has two rationales. First, EPA objections are reviewable because, as required by the CWA, they are accompanied by a clear record of the reasons for objection, whereas "when the Agency decides not to act, there may be no

record to review." *Id.* at 859–60. Second, the D.C. Circuit found nothing that required any EPA action at all on state-issued NPDES permits:

> The Clean Water Act allows the EPA to choose whether to participate in the application for a state NPDES permit. The Act also gives the EPA freedom to waive notice of the application and to waive any violations in the permit. Certain guidelines apply to application process, but these guidelines do not bind the Agency in its supervisory role of monitoring state permits.

*Id.* at 861. Further, the *Schramm* court refused to find that the EPA had "issued" a permit simply by refusing to veto a state-issued NPDES permit. *See id.* at 862. The case suggests that the plaintiffs would seek relief more properly in state court.[8] *Schramm* also cited the Second Circuit's *Mianus River* and the Fifth Circuit's *Save the Bay, Inc. v. EPA*[9] as support for the proposition that, absent an EPA objection, federal courts had no jurisdiction to review state permitting decisions.

Because *Schramm* is the controlling law in this circuit, the court concludes that it must also dismiss plaintiffs' claims involving EPA silence on state denials of NPDES permits as well as state issuances of permits banning blending. As *Schramm* and other cases suggest, the proper venue for relief regarding these claims is state court. CWA regulations require that states authorized to issue NPDES permits "provide an opportunity

---

8. *Schramm,* 631 F.2d at 863 ("[C]ongressional silence on federal court review of state permits is consistent with the view that challengers to those permits should be relegated to state law remedies in state courts.").

9. 556 F.2d 1282 (5th Cir.1977). The Fifth Circuit held that Section 1369(b)(1)(F) "should not be construed to encompass re-

view of EPA's action in failing to veto a state NPDES permit." *Id.* at 1292. Furthermore, *Save the Bay* also denied federal district courts any role in reviewing such permitting decisions because "EPA's decision not to veto a particular permit takes on a breadth that in our judgment renders the bottom line unreviewable in the federal courts." *Id.* at 1295.

for judicial review in State Court of the final approval or denial of permits by the State courts." 40 C.F.R § 123.30. *See Potter v. ASARCO Inc.,* 1999 WL 33537055 (D.Neb. Apr. 23, 1999) (finding that those challenging state-issued permits must avail themselves of state judicial review and that "courts have generally denied federal judicial review of state-issued permits").

## D. Action "Unreasonably Withheld"

■ One last response by plaintiffs to defendants' jurisdictional argument is the suggestion, independent of the "final agency action" requirement for judicial review under the APA, that this court has jurisdiction over the case under a separate APA provision which they claim allows a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see* Pls.' Opp'n to Mot. to Dismiss at 42. Plaintiffs claim that agency action has been unlawfully or unreasonably delayed under section 706(1) because "EPA Headquarters' now longstanding knowledge that the Regions are implementing ultra vires activities and repeated failure to rein in such activities." *Id.* This argument is without merit. Nothing plaintiffs cite supports the proposition that Section 706(1) could provide a court jurisdiction in the absence of "final agency action" as required by Section 704. The one case plaintiffs cite that deals with Section 706(1) clearly indicates that the provision governs the appropriate scope and standard of review for agency action, not judicial review. *See id.* (citing *Envtl. Def. Fund v. Costle,* 657 F.2d 275, 283–84 (D.C.Cir.1981)). Nothing in *Costle* suggest that section 706(1) can confer jurisdiction on a court in the absence of final agency action. *See id.*

## CONCLUSION

This decision may seem like a jurisdictional Catch–22 for plaintiffs. On the one hand, the regional guidance documents alone do not constitute final agency action giving rise to judicial review. On the other, permitting decisions banning blending, though constituting final agency action, either fall under the exclusive jurisdiction of the Court of Appeals or under the discretion of the Administrator-either way outside of the reach of this court. This apparent quandary, however, is a function of the structures of the APA and CWA. The APA attempts to strike a balance between giving administrative agencies enough freedom to develop national policies without unnecessary judicial interference and giving parties sufficiently affected by administrative actions recourse to the courts. The CWA attempts to encourage states to take responsibility for permitting while allowing the EPA to intervene if the states are derelict in their duties under the NPDES. Whether the somewhat labyrinthine judicial review provisions of the APA and CWA, and the case law applying these statutes, ultimately avoids creating a "seemingly irrational bifurcated system" or helps to further the policies of the APA and CWA is not for this court to decide. To be sure, federal agencies should not use the intricacies of the APA to avoid judicial review by, for instance, labeling policies "interim" or "non-final" and then proceeding to enforce them. *See Appalachian Power,* 208 F.3d at 1020 (disparaging attempts by administrative agencies to "immuniz[e] its lawmaking from judicial review" by manipulating the APA and categorizing its policies as "non-final"). In this case, the APA and CWA seem to have shielded the EPA from legal action over genuine conflicts-within the national EPA, between different EPA Regions, and between the EPA regions and state permitting authorities-over the validity blending and emergency outfalls which it has yet to resolve.

In the end, however, the provisions of the APA preclude judicial review of the regional EPA guidance documents to the

extent that they have not affected permitting for particular POTWs. Section 1369(b)(1)(F), by vesting exclusive jurisdiction with the Courts of Appeals, prevents this court from hearing matters involving regional EPA objections to state-issued permits. The APA also prevents this court from hearing claims involving EPA inaction on state-issued permits. Therefore, defendants' motion to dismiss for lack of jurisdiction is granted.

An appropriate order accompanies this memorandum.

### JUDGMENT

For the reasons stated in the court's memorandum opinion docketed this same day, it is this 20th day of November, 2003, hereby

**ORDERED** that **JUDGMENT** is entered in favor of defendants and against plaintiffs.